RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0234p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

CLIFFORD CHARLES TYLER,

*Plaintiff-Appellant,*

*v.*

No. 13-1876

HILLSDALE COUNTY SHERIFF'S DEPARTMENT, et al.,

*Defendants-Appellees.*

—————————————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:12-cv-00523—Gordon J. Quist, District Judge.

Argued: October 14, 2015

Decided and Filed: September 15, 2016

Before: COLE, Chief Judge; BOGGS, SILER, BATCHELDER, MOORE, CLAY,
GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE,
WHITE, STRANCH, and DONALD, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:** Lucas J. McCarthy, Wyoming, Michigan, for Appellant. Abby C. Wright, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. **ON
BRIEF:** Lucas J. McCarthy, Wyoming, Michigan, for Appellant. Abby C. Wright, Michael S.
Raab, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal
Appellees. Paul D. Clement, Erin E. Murphy, Stephen V. Potenza, BANCROFT PLLC,
Washington, D.C., Harry Frischer, PROSKAUER ROSE LLP, New York, New York, Simon J.
Frankel, Rebecca Jacobs, COVINGTON & BURLING LLP, San Francisco, California, Daniel
B. Asimow, ARNOLD & PORTER LLP, San Francisco, California, Ronda Cress, Michael
Kirkman, Kristen Henry, OHIO DISABILITY RIGHTS LAW & POLICY CENTER, INC.,
Columbus, Ohio, for Amici Curiae.

GIBBONS, J., delivered the lead opinion in which SILER, COOK, McKEAGUE,
WHITE, and DONALD, JJ., joined, and ROGERS, J., joined in part. McKEAGUE (pg. 28), and
WHITE (pp. 29–31), JJ., delivered separate concurring opinions. BOGGS, J. (pg. 32),

1

BATCHELDER, J. (pp. 33–40), in which BOGGS, J., joined, and SUTTON, J. (pp. 41–50), in which BOGGS, McKEAGUE, and KETHLEDGE, JJ., joined, delivered separate opinions concurring in most of the judgment. ROGERS, J. (pg. 51), delivered a separate opinion concurring in the lead opinion in part, dissenting from the result, and joining Part II.B. of the dissenting opinion of MOORE, J. MOORE, J. (pp. 52–62), delivered a separate dissent in which COLE, C.J., CLAY, GRIFFIN, and STRANCH, JJ., joined, and ROGERS, J., joined in part.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge. Plaintiff-Appellant Clifford Charles Tyler, a prospective gun purchaser, was involuntarily committed thirty years ago following an emotional divorce. Despite being three decades removed from this brief depressive episode, and despite a currently clean bill of mental health, Tyler is ineligible to possess a firearm because of his prior involuntary commitment, pursuant to 18 U.S.C. § 922(g)(4). After the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) declined to review his petition for restoration of his right to own a firearm, Tyler filed suit in federal court seeking a declaratory judgment that § 922(g)(4) is unconstitutional as applied to him. The district court dismissed Tyler's suit for failure to state a claim.

Since 2008, the lower courts have struggled to delineate the boundaries of the right recognized by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Tyler's case presents an important question in light of the Supreme Court's decision. On the one hand, the *Heller* Court recognized, for the first time, that the Second Amendment protected the fundamental right of "law-abiding, responsible citizens" to own firearms. *Id.* at 635. On the other, it recognized that this right was not "unlimited" and observed that longstanding prohibitions on the possession of firearms by felons and the mentally ill are "presumptively lawful." *Id.* at 595, 626–27 n.26. We must decide whether, in consideration of *Heller*, Tyler, "who has been committed to a mental institution," § 922(g)(4), has a cognizable claim under the Second Amendment and, if so, how to properly scrutinize his claim.

The district court dismissed Tyler's suit for failure to state a claim, reasoning that *Heller*'s statement regarding "presumptively lawful" prohibitions on the mentally ill foreclosed

such claims. The court also observed that § 922(g)(4) would survive intermediate scrutiny. Unlike the district court, we do not understand *Heller*'s pronouncement about presumptively lawful prohibitions to insulate § 922(g)(4) from constitutional scrutiny nor do we believe that on the record as it currently stands the government has carried its burden to show that § 922(g)(4)'s permanent ban is substantially related to the government's important interests in reducing crime and preventing suicide. Because Tyler's complaint states a valid claim under the Second Amendment, we reverse and remand.

## I. Background

### A. Statutory and Regulatory Background

18 U.S.C. § 922(g) of the Gun Control Act prohibits numerous categories of people from gun ownership, including convicted felons, § 922(g)(1), habitual drug users, § 922(g)(3), and domestic-violence misdemeanants, § 922(g)(9). The act also prohibits anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution" from possessing a firearm. § 922(g)(4). Federal regulations make clear that "committed to a mental institution" applies only to persons who are *involuntarily* committed by an appropriate judicial authority following due process safeguards. *See* 27 C.F.R. § 478.11 (defining "committed to a mental institution").

Besides categorical bans, the Act also includes a relief-from-disabilities program under which barred individuals may apply "to the Attorney General for relief from the disabilities imposed by Federal laws." 18 U.S.C. § 925(c). Authority to administer the relief-from-disabilities program has been delegated to the director of the ATF. 28 C.F.R. § 0.130(a)(1); 27 C.F.R. § 478.144(b) (providing that "[a]n application for such relief shall be filed . . . with the Director [of ATF]"). Under § 925(c), the ATF director is empowered to grant relief if he or she is satisfied "that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." Judicial review is available in the federal district court of appropriate jurisdiction to "[a]ny person whose application for relief . . . is denied by the [ATF]." *Id.* The reviewing court is empowered to "admit additional evidence where failure to do so would result in a miscarriage of justice." *Id.*

The ATF's decision is reviewed under an arbitrary and capricious standard. *United States v. Bean*, 537 U.S. 71, 77–78 (2002).

Section 925(c), however, is currently a nullity. Congress defunded the relief-from-disabilities program in 1992, noting that reviewing applications was a "very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made." S. Rep. No. 102-353, at 19 (1992). Congress has reaffirmed its appropriations restrictions numerous times since then. *See Bean*, 537 U.S. at 75 n.3 (listing subsequent appropriations decisions); *Mullis v. United States*, 230 F.3d 215, 219 (6th Cir. 2000). Moreover, the Supreme Court has held that Congress's decision to defund the program stripped the federal courts of jurisdiction to review claims arising under § 925(c). *Bean*, 537 U.S. at 78 ("[T]he absence of an actual denial of [a] respondent's petition by ATF precludes judicial review under § 925(c)").

Still, in early 2008, Congress renewed the possibility that certain prohibited individuals could have their right to possess a gun restored. Seeking to remedy weaknesses in the national instant criminal background check system (NICS), Congress authorized federal grants to encourage the states to supply accurate and up-to-date information to federal firearm databases. *See* NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, § 103, 121 Stat. 2559, 2567 (2008). Eligibility for the grants is based, in part, on the creation of a relief-from-disabilities program that allows individuals barred by § 922(g)(4) to apply to have their rights restored. *Id.* at §§ 103, 105, 121 Stat. at 2568–69.[1] Under qualifying programs, "a State court, board, commission, or other lawful authority shall grant the relief . . . if the circumstances regarding the disabilities . . . and the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." *Id.* § 105(a)(2), 121 Stat. at 2569–70. The state program must also "permit[] a person whose application . . . is denied to file a petition with the State court of appropriate jurisdiction for a de novo judicial review of the denial." *Id.*

---

[1]Unlike the federal relief-from-disabilities program, which offered relief to all persons prohibited from gun possession under federal law, the state programs need only provide relief to individuals "who [have] been adjudicated as a mental defective or who [have] been committed to a mental institution." § 922(g)(4); *see* Pub. L. No. 110-180 § 105(a)(1).

§ 105(a)(3), 121 Stat. at 2570.  The government represented in its supplemental brief that thirty-one states have created qualifying relief programs.[2]  Tyler's home state of Michigan is not one of them.

## B.  Factual Background

The complaint and attached documents set out the factual background of the case.  Tyler is a seventy-four-year-old resident of Hillsdale County, Michigan.  According to a 2012 substance-abuse evaluation, in 1985, Tyler's wife of twenty-three years ran away with another man, depleted Tyler's finances, and then served him with divorce papers.  The ordeal left Tyler emotionally devastated.  He had trouble sleeping and sat at home "in the middle of the floor . . . pounding his head."  (DE 1-1, Ex. C, Page ID 23.)  Fearing that their father was a danger to himself, Tyler's daughters contacted local police, who transported Tyler to the sheriff's department and began the necessary steps for Tyler to receive a psychological evaluation.

On January 2, 1986, Tyler, represented by counsel, appeared before the Hillsdale County Probate Court. Court documents indicate that Dr. Tamara Marie Tyler[3] examined Tyler.  She concluded that Tyler required in-patient treatment and petitioned the probate court to have Tyler committed.  The probate court found by "clear and convincing evidence" that Tyler was mentally ill and that because of his illness he could "be reasonably expected within the near future to intentionally or unintentionally seriously physically injure [himself] or others, and has engaged in an act or acts or made significant threats that are substantially supportive of the expectation." (DE 1-2, Ex. F, Page ID 36.)  The court further noted that hospitalization was the only treatment method "adequate to meet [Tyler's] treatment needs."  (*Id*.)

The court committed Tyler to Ypsilanti Regional Center "for a period not to exceed 30 days" and ordered him to undergo further treatment "for a period not to exceed 90 days." (*Id.* at 36–37.)  According to his 2012 substance-abuse evaluation, when Tyler arrived at Ypsilanti

---

[2]The actual number of states with qualifying relief-from-disabilities programs is uncertain.  While the government puts the number at thirty-one, the Bureau of Justice Statistics states that as of September 2015, twenty-nine states have enacted qualifying programs.  The Bureau also notes that only twenty-two states received NICS Improvement Act funding in 2015.  Bureau of Justice Statistics, The NICS Improvement Amendments Act of 2007, http://www.bjs.gov/index.cfm?ty=tp&tid=49#2011 (last visited March 17, 2016).

[3]We are not aware that Dr. Tyler has any relation to Appellant.

Regional Center, he was depressed and had bruises on his head and face. Tyler reported that he stayed at the in-patient center for two to four weeks[4] but declined prescription medication for fear it would alter his "thinking." (DE 1-1, Ex. C, Page ID 23.) Tyler also reported that he received no follow-up therapy after he was discharged from the hospital.

After his discharge, Tyler returned home and successfully held a job for the next eighteen or nineteen years. He also remarried in 1999. In 2012 Tyler underwent both a substance-abuse and a psychological evaluation. During his psychological evaluation, Tyler reported that he has "never experienced a depressive episode" other than the one following his divorce. (DE 1-1, Ex. B, Page ID 19.) He also stated that he maintains a close relationship with his daughters and that he has repaired his relationship with his ex-wife. Dr. Osentoski observed that Tyler's "[c]ognitive ability appeared to be in the average range" and that there was "no evidence of thought disorder . . . [or] hallucinatory phenomena." (*Id.* at 20.) She also noted that Tyler's personal physician reported no signs of mental illness. Osentoski concluded that Tyler's response to his divorce was a "brief reactive depressive episode," but that, at the time of his evaluation, Tyler did not present any "evidence of mental illness." (*Id.*) Tyler's substance-abuse evaluation reveals no issues with alcohol or drug abuse, and it notes that Tyler has had no past legal involvement.

## C. Procedural History

Tyler alleges that, on February 7, 2011, he unsuccessfully attempted to purchase a gun. The Hillsdale County Sheriff's Office informed Tyler that he was ineligible to purchase a firearm because the NICS Background Check System indicated that he had previously been committed to a mental institution. In August 2011, Tyler appealed the denial to the FBI's NICS section. On January 6, 2012, the NICS section denied Tyler's appeal, explaining that the NICS Improvement Amendments Act of 2007 "provides states with the ability to pursue an ATF-approved relief of disability for individuals . . . who have been committed to a mental institution" but that "[u]ntil [Michigan] has an ATF approved relief from disabilities program in place [Tyler's] federal

---

[4]Tyler's 2012 psychological evaluation notes that records from his hospitalization at Ypsilanti Regional Center are unavailable because the Hospital closed many years ago.

firearm rights may not be restored." (DE 1, Compl. ¶ 33, Page ID 7; DE 1-2, Ex. G, Page ID 39–40.)

On May 21, 2012, Tyler sued various county, state, and federal defendants in federal court.[5] He alleged that, given Michigan's lack of relief-from-disabilities program, § 922(g)(4) was unconstitutional as applied to him because it operated as an essentially permanent ban on his fundamental Second Amendment right to keep and bear arms. Tyler also averred that § 922(g)(4), as applied, violates the equal protection clause and that the government's failure to afford him notice and an opportunity to be heard on the matter violates the Due Process clauses of the Fifth and Fourteenth Amendments.

The federal defendants moved to dismiss Tyler's complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion, relying on *Heller*'s observation that prohibitions on the possession of firearms by the mentally ill were presumptively lawful and concluding that Tyler was not within the ambit of the Second Amendment as historically understood. The court went on to conclude that § 922(g)(4) would survive intermediate scrutiny. The court focused heavily on Congress's decision to rely on prior judicial determinations in commitment proceedings and reasoned that there was a substantial relationship between the government's interest in keeping firearms out of the hands of presumptively risky people and § 922(g)(4)'s prohibition, even without a means for post-commitment review. After the court dismissed Tyler's claims against the federal defendants, the remaining parties agreed that the court's rationale would likewise foreclose claims against the county defendants. The parties also recognized and agreed that Tyler's claims under the Fifth and Fourteenth Amendments were coterminous with his Second Amendment claim. Tyler's Second Amendment claim is the only issue on appeal.

## II.  Standard of Review

We review *de novo* the district court's dismissal for failure to state a claim. *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007). We must

---

[5]Tyler stipulated to the dismissal of his claims against the state defendants. They are not party to this appeal.

accept the factual allegations in the plaintiff's complaint as true and construe the complaint in the light most favorable to the plaintiff. *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005).

## III. Analysis

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court recognized in *Heller* that the amendment secures "an individual right to keep and bear arms" without regard to militia service. 554 U.S. at 577, 595. The core right recognized in *Heller* is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

This right, however, is "not unlimited, just as the First Amendment's right of free speech [is] not." *Id.* at 595. For example, the *Heller* court noted that the Second Amendment does not confer a right to possess any kind of weapon for whatever reason. *Id.* at 595, 627 (noting that the Second Amendment does not protect "the right of citizens to carry arms for *any sort* of confrontation" and recognizing the "historical tradition of prohibiting the carrying of dangerous and unusual weapons" (citations and internal quotation marks omitted)). The Court also recognized the government's power to restrict the "carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626. In addition to the *what* and the *where* of the Second Amendment, the *Heller* court also identified *who* the government may presumptively regulate. Whereas "law-abiding, responsible citizens" are at the core of the Amendment's protections, "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are "presumptively lawful." *Id.* at 626–27 & n.26, 635.

Tyler's claim implicates one of these presumptively lawful regulations governing who may possess a firearm, § 922(g)(4). He asserts that the Second Amendment forbids Congress from permanently prohibiting firearm possession by currently healthy individuals who were long ago committed to a mental institution.

## A.

Like several of our sister circuits, we have adopted a two-step framework to resolve Second Amendment challenges. *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States v. Chester (Chester I)*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010). The first step "asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood." *Greeno*, 679 F.3d at 518 (citing *Chester I*, 628 F.3d at 680). If the government establishes that the challenged law regulates activity outside the scope of the Second Amendment as understood at the time of the framing of the Bill of Rights, the activity is unprotected and the law is not subjected to further constitutional scrutiny. *Id.* If, however, the historical evidence is inconclusive or suggests that the regulated activities—or in our case the regulated individuals—are not categorically unprotected, then we must ascertain the appropriate level of scrutiny and examine the "strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011). *Heller* rejected rational-basis review but otherwise left the issue open. 554 U.S. at 628 n.27. Thus, unless the conduct at issue is categorically unprotected, the government bears the burden of justifying the constitutionality of the law under a heightened form of scrutiny.

Before beginning our two-step inquiry, however, we must answer a threshold question: To what extent does *Heller* itself provide an answer to the constitutionality of § 922(g)(4) as applied to Tyler? As noted above, the *Heller* Court recognized that the Second Amendment secures and protects an individual right to keep and bear arms. 554 U.S. at 595. But the Court also noted that the right was "not unlimited" and cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 595, 626. The *Heller* Court called these longstanding prohibitions "presumptively lawful." *Id.* at 627 n.26. The Court's assurances confirm that the Second Amendment is not an absolute barrier to congressional regulation of firearms and that some categorical prohibitions are assumed to be constitutional. *See United States v. Carter (Carter I)*, 669 F.3d 411, 420–21 (4th Cir. 2012); *United States v. Skoien (Skoien II)*, 614 F.3d 638, 641

(7th Cir. 2010) (en banc) ("[S]ome categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons . . . ."). However, in making this observation, the Court expressly noted that it was not "clarify[ing] the entire field" of the Second Amendment, and, importantly, the Court reserved for later cases an exploration of the historical justifications for its enumerated prohibitions. *Heller*, 554 U.S. at 635.

*Heller* does not resolve this case on its own terms. While we "are obligated to follow Supreme Court dicta," *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002) (citation omitted), *Heller* only established a presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis.[6] A presumption implies "that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge." *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (applying intermediate scrutiny in challenge to § 922(g)(1)); *Chester I*, 628 F.3d at 679 ("[T]he phrase '*presumptively lawful regulatory measures*' suggests the possibility that one or more of these 'longstanding' regulations 'could be unconstitutional in the face of an as-applied challenge.'" (quoting *Williams*, 616 F.3d at 692)). We do not take *Heller*'s "presumptively lawful" dictum to foreclose § 922(g)(4) from constitutional scrutiny. The mere fact that Congress created a categorical ban does not give the government a free pass; it must still be shown that the presumption applies in the instant case.[7] *See Williams*, 616 F.3d at 692. As the Seventh Circuit has recognized, the *Heller* Court's observation regarding the presumptive lawfulness of longstanding bans is precautionary, not conclusive:

---

[6]"Some courts have treated *Heller*'s listing of 'presumptively lawful regulatory measures,' for all practical purposes, as a kind of 'safe harbor,'" but "[t]his approach . . . approximates rational-basis review, which has been rejected by *Heller*." *Chester I*, 628 F.3d at 679; *see also United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) ("Rather than seriously wrestling with how to apply this new Second Amendment rule, . . . courts will continue to simply reference the applicable *Heller* dictum and move on.").

[7]Two courts of appeals have refused to rely solely on *Heller* to resolve constitutional challenges to § 922(g)(3), which makes it a crime for habitual drug addicts to possess a gun while they are abusing illegal substances. *See Carter I*, 669 F.3d at 420; *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010). Despite the fact that "[k]eeping guns away from habitual drug users is analogous to disarming felons," *Yancey*, 621 F.3d at 684, these courts have subjected § 922(g)(3) to a heightened form of means-end scrutiny. *Id*. at 683; *Carter I*, 669 F.3d at 417.

> Instead of resolving questions such as the one we must confront, the Justices have told us that the matters have been left open. The language . . . warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. *What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open.* The opinion is not a comprehensive code; it is just an explanation for the Court's disposition.

*Skoien II*, 614 F.3d at 640 (emphasis added).

Refusing to give *Heller* conclusive effect in this case is particularly proper given § 922(g)(4)'s lack of historical pedigree. *Heller*'s analytical structure and its conclusions command resort to historical evidence in determining the scope of the Second Amendment. Although the Supreme Court observed that bans on gun possession by the mentally ill are "longstanding," *Heller*, 554 U.S. at 626, "legal limits on the possession of firearms by the mentally ill . . . are of 20th Century vintage." *Skoien II*, 614 F.3d at 641. Indeed, § 922(g)(4) was not enacted until 1968. Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1220. As will be explained in more detail below, the parties have produced scant historical evidence conclusively supporting a permanent ban on the possession of guns by anyone who has been committed to a mental institution. In the absence of such evidence, it would be odd to rely solely on *Heller* to rubber stamp the legislature's power to permanently exclude individuals from a fundamental right based on a past involuntary commitment.

*Heller* spoke of bans on "the mentally ill." 554 U.S. at 626. While we can only guess whether the *Heller* Court had in mind § 922(g)(4) as opposed to state restrictions, or no particular restriction at all[8]—we note that § 922(g)(4) does not use the phrase "mentally ill," nor does it attempt to prohibit all currently mentally ill persons from firearm possession. Rather, the statute uses prior judicial adjudications—incompetency and involuntary commitment—as proxies for mental illness. *See United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012) ("[S]ection 922(g)(4) does not bar firearms possession for those who are or were mentally ill and dangerous, but (pertinently) only for any person 'who has been adjudicated as a mental defective' or 'has been committed to a mental institution.'"). Prior involuntary commitment is

---

[8]The *Heller* Court did not cite § 922(g)(4) or any other provision of § 922(g) for that matter.

not coextensive with current mental illness: a point the government concedes in its brief, and a point Congress recognized when it enacted the NICS Improvement Amendments Act, thereby allowing states to restore the right to possess a gun to persons previously committed.  153 Cong. Rec. 28,948 (2007) (statement of Rep. C. McCarthy) ("[r]ecogniz[ing] that mental illness is not necessarily a permanent impediment" and noting that the NICS "would . . . allow States to establish procedures that permit a person disqualified on the basis of legal mental illness to prove to the State that he or she no longer poses a danger to society.")  Therefore, we may not resolve this case solely in reliance on *Heller*'s precautionary language, as we did in rejecting a Second Amendment challenge to a denial of an expungement motion in a case involving § 922(g)(1)'s bar on the possession of firearms by felons.  *See United States v. Carey*, 602 F.3d 738, 740–41 (6th Cir. 2010).**⁹**

To rely solely on *Heller*'s presumption here would amount to a judicial endorsement of Congress's power to declare, "Once mentally ill, always so."  This we will not do.  *Heller*'s presumption of lawfulness should not be used to enshrine a permanent stigma on anyone who has ever been committed to a mental institution for whatever reason.  Some sort of showing must be made to support Congress's adoption of prior involuntary commitments as a basis for a categorical, permanent limitation on the Second Amendment right to bear arms.  This conclusion is particularly appropriate in this case.  Tyler's complaint and supporting documents suggest that Tyler is thirty years removed from a brief depressive episode and that he has had no intervening mental health or substance abuse problems since that time.  This factual scenario calls into question the applicability of § 922(g)(4)'s lifetime ban to Tyler and likewise calls into question the applicability of *Heller*'s presumption of lawfulness to his Second Amendment claim.  With this understanding in place, we proceed to consider Tyler's claim under our two-step framework.

### B.  *Greeno* Step One

*Greeno*'s first step asks "whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood."  679 F.3d at 518 (citation

---

**⁹**A felony conviction, unlike an adjudication of incompetence or involuntary commitment, "trigger[s] a number of disabilities, many of which impact fundamental constitutional rights."  *United States v. Barton*, 633 F.3d 168, 175 (3d. Cir. 2011) (citing cases where the Supreme Court upheld laws disenfranchising felons and restricting felons' fundamental right to travel).

omitted).    Laws that regulate activity "falling outside the terms of the right as publicly understood when the Bill of Rights was ratified" will survive constitutional scrutiny.  *Id.* (citation omitted). Because the relevant portion of § 922(g)(4) prohibits a class of persons—those with a prior involuntary commitment—we  must determine whether those people, rather than their conduct, fall completely outside the reach of the Second Amendment.  *See Chester I*, 628 F.3d at 680; *Skoien II*, 614 F.3d at 649 (Sykes, J., dissenting).  The government bears the burden at step one to conclusively demonstrate that the challenged statute burdens persons historically understood to be unprotected.  *See Greeno,* 679 F.3d at 518.

The government relies on both historical sources and historical scholarship to trace § 922(g)(4)'s historical lineage.  First, it refers to "a proposal offered by the Pennsylvania anti-federalist faction at the Pennsylvania Convention."  (CA6 R. 43, Appellee Br. at 17.)  The proposal states in relevant part that "no law shall be passed for disarming the people or any of them, unless for crimes committed, *or real danger of public injury from individuals*."  The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted in* 2 Bernard Schwartz, *The Bill of Rights, A Documentary History* 665 (1971) (emphasis added).  The government also cites Samuel Adams's proposal at the Massachusetts ratifying convention.  The proposal recommended that "the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States *who are peaceable citizens*, from keeping their own arms."  *Id.* at 675, 681 (emphasis added).  While these sources provide a clear basis for *Heller*'s recognition that "law-abiding, responsible citizens" are at the core of the Second Amendment, they move us no closer to an understanding of which individuals were considered part of that group in 1791.

The government also posits that Second Amendment scholars "agree that the right to bear arms was tied to the concept of a virtuous citizenry."  (Appellee Br. at 18 (quoting *Yancey*, 621 F.3d at 684–85).)  But, again, that the Founders understood the Amendment to protect the virtuous does not explain who was counted among that class.  In an attempt to justify the lack of historical evidence, the government relies on a passage from *Yancey* explaining that "the absence of historical statutory prohibitions on firearm possession [by the mentally ill] may have been the consequence of the fact that 'in eighteenth-century America, justices of the peace were

authorized to lock up lunatics who were dangerous.'" 621 F.3d at 685 (quoting Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009)). However, Professor Larson, in the same article relied on by *Yancey*, noted that "[o]ne searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership." 60 Hastings L.J. at 1376.

Ultimately, we agree with the district court that the "historical evidence cited by *Heller* and [the government] does not directly support the proposition that persons who were once committed due to mental illness are forever ineligible to regain their Second Amendment rights." (DE 28, Opinion, Page ID 239–40.)

Despite the lack of conclusive historical support, however, the district court, relying on *Heller*'s "presumptively lawful" dictum, concluded that "the government has satisfied its burden of establishing that the Second Amendment, as historically understood, does not extend to [Tyler]." (*Id.* at 240.) The government urges this same conclusion on appeal. It argues that "the Supreme Court's statement in *Heller* that restrictions on gun ownership by the mentally ill and felons are 'presumptively lawful' indicates that prohibiting these groups of individuals from possessing firearms does not implicate the Second Amendment." (CA6 R. 62, Appellee's Supplemental Br. at 8.) Given that the district court came to what we see as contradictory conclusions about the place of mentally ill persons within the historical scope of the Second Amendment, the need arises to clarify how the *Heller* Court's "presumptively lawful" language should inform our two-step analysis. 554 U.S. at 627 n.26.

To be certain, *Heller*'s dictum bears an uncertain relationship with the two-pronged approach we use to analyze Second Amendment claims.[10] This tension is particularly acute in

---

[10]Other courts of appeals have had trouble reconciling *Heller*'s "presumptively lawful" language with a two-pronged approach that looks to history and then applies traditional means-end scrutiny. *See NRA v. ATF (NRA I)*, 700 F.3d 185, 196 (5th Cir. 2012) ("It is difficult to discern whether [*Heller*'s exceptions], by virtue of their presumptive validity, either (i) presumptively fail to burden conduct protected by the Second Amendment, or (ii) presumptively trigger and pass constitutional muster under a lenient level of scrutiny."); *Chester I*, 628 F.3d at 679 ("It is unclear to us whether *Heller* was suggesting that 'longstanding prohibitions' such as these were historically understood to be valid limitations on the right to bear arms or did not violate the Second Amendment for some other reason.").

cases like Tyler's where the regulation at issue is of the type expressly mentioned by the *Heller* court. In mapping *Heller*'s "presumptively lawful" language onto the two-step inquiry, it is difficult to discern whether prohibitions on felons and the mentally ill are presumptively lawful because they do not burden persons within the ambit of the Second Amendment as historically understood, or whether the regulations presumptively satisfy some form of heightened means-end scrutiny. Ultimately, the latter understanding is the better option. *See Chester I*, 628 F.3d at 679 ("[E]ven if the listed regulations were not historical limitations on the scope of the Second Amendment, the Court could still have viewed the regulatory measures as 'presumptively lawful' if it believed they were valid on their face under any level of means-end scrutiny applied."). The *Heller* Court expressly declined to expound upon the historical justifications for bans on firearm possession by felons and the mentally ill. 554 U.S. at 635. In the face of what is at best ambiguous historical support, it would be peculiar to conclude that § 922(g)(4) does not burden conduct within the ambit of the Second Amendment as historically understood based on nothing more than *Heller*'s observation that such a regulation is "presumptively lawful." 554 U.S. at 627 n.26. We proceed to step two, then, with an understanding that people who have been involuntarily committed are not categorically unprotected by the Second Amendment.

### C. *Greeno* Step Two

Under *Greeno*, if the government does not meet its burden of establishing that the regulated conduct fell outside the scope of the Second Amendment as historically understood at the framing, then we proceed to analyze "the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." 679 F.3d at 518. It is here where we must decide and apply the appropriate level of scrutiny. Because *Heller* rules out rational basis, the choice is between intermediate and strict scrutiny. 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *see also Chester I*, 628 F.3d at 682. Given *Heller*'s focus on "core" Second Amendment activity, our choice of scrutiny level should be informed by "(1) 'how close the law comes to the core of the Second Amendment right,' and (2) 'the severity of the law's

burden on the right.'" *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) (quoting *Ezell*, 651 F.3d at 703); *see also Chester I*, 628 F.3d at 682.

Although Tyler's position on the appropriate level of scrutiny has changed during the pendency of his appeal, before the *en banc* court he asserts that strict scrutiny is appropriate. He maintains that (1) he "is the sort of responsible, law-abiding citizen that Blackstone and the Supreme Court have recognized" at the core of the Second Amendment, and that (2) § 922(g)(4) completely and permanently extinguishes his core right to use a firearm in defense of hearth and home and thus triggers strict scrutiny. (CA6 R.53, Appellant's Supplemental Br. at 8–9.) We will take these arguments in turn.

To hold, as Tyler requests, that he is at the core of the Second Amendment despite his history of mental illness would cut too hard against Congress's power to categorically prohibit certain presumptively dangerous people from gun ownership. As the Seventh Circuit recognized, the *Heller* Court understood that Congress's power to enact categorical disqualifications was "part of the original meaning" of the Second Amendment. *Skoien II*, 614 F.3d at 640. Reviewing § 922(g)(4) under strict scrutiny would invert *Heller*'s presumption that prohibitions on the mentally ill are lawful. *See Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 276 F.3d 876, 879 (6th Cir. 2002) (noting that under strict scrutiny, "[w]e start by presuming that the ordinance is unconstitutional").[11] Moreover, "[t]he risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test." *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015). In light

---

[11]In his *Heller* dissent, Justice Breyer concluded that it would be inappropriate to apply strict scrutiny to the majority's enumerated, presumptively lawful prohibitions:

> Respondent proposes that the Court adopt a "strict scrutiny" test, which would require reviewing with care each gun law to determine whether it is "narrowly tailored to achieve a compelling governmental interest." *Abrams v. Johnson*, 521 U.S. 74, 82 (1997); see Brief for Respondent 54–62. But the majority implicitly, and appropriately, rejects that suggestion by broadly approving a set of laws—prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales—whose constitutionality under a strict-scrutiny standard would be far from clear.

554 U.S. at 688 (Breyer, J., dissenting).

of this cogent difference, we should caution against imposing too high a burden on the government to justify its gun safety regulations, particularly where Congress has chosen to rely on prior judicial determinations that individuals pose a risk of danger to themselves or others.

Tyler also argues that § 922(g)(4) completely and permanently extinguishes his core right to use a firearm in defense of hearth and home, and this heavy burden triggers strict scrutiny. Tyler gets it half right. In one way, § 922(g)(4) is a severe restriction. It permanently prohibits Tyler from possessing all types of firearms, even in his home. In another way, however, § 922(g)(4) is narrow. Like the other provisions of § 922(g), § 922(g)(4) does not burden the public at large; it burdens only a narrow class of individuals who are not at the core of the Second Amendment—those previously adjudicated mentally defective or previously involuntarily committed. *See United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (opting to apply intermediate scrutiny to § 922(g)(8) in part because the "statute[] prohibit[s] the possession of firearms by [a] narrow class[] of persons who, based on their past behavior, are more likely to engage in domestic violence"). We add that the permanence of § 922(g)(4)'s prohibition does not necessarily require us to apply strict scrutiny. Sections 922(g)(1) and (9), which also impose permanent bans, have been consistently reviewed under intermediate scrutiny. *See Chovan*, 735 F.3d at 1138 (applying intermediate scrutiny in challenge to § 922(g)(9)); *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011) (applying the equivalent of intermediate scrutiny to § 922(g)(9)); *United States v. Staten*, 666 F.3d 154, 159 (4th Cir. 2011) (applying intermediate scrutiny in challenge to § 922(g)(9)); *Chester I*, 628 F.3d at 682–83 (same); *Williams*, 616 F.3d at 692–93 (applying intermediate scrutiny in challenge to § 922(g)(1)).

With strict scrutiny put aside, there is only one choice left: intermediate scrutiny. Intermediate scrutiny is preferable in evaluating challenges to § 922(g)(4) and similar prohibitions. *See Bonidy*, 790 F.3d at 1126 (reasoning that "intermediate scrutiny makes sense in the Second Amendment context" because of the inherent risk that the right of self-defense poses to others). Such an approach "appropriately places the burden on the government to justify its restriction[], while also giving [Congress] considerable flexibility to regulate gun safety." *Id.* Section 922(g)(4) does not burden the core of the Second Amendment right, but it does place a

substantial burden on conduct and persons protected by the Second Amendment.  Accordingly, we conclude that intermediate scrutiny is the appropriate standard.[12]

Many of our sister circuits have also held that intermediate scrutiny is applicable.  In the wake of *Heller*, the federal courts of appeals have heard numerous constitutional challenges to the various prohibitions enumerated in § 922(g).  A non-exhaustive review of these cases reveals a near unanimous preference for intermediate scrutiny.[13]  As noted previously, courts have consistently applied intermediate scrutiny to § 922(g)(9)'s ban on convicted domestic-violence misdemeanants.  *See Chovan*, 735 F.3d at 1137–38; *Staten*, 666 F.3d at 159; *Booker*, 644 F.3d at 25; *Chester I*, 628 F.3d at 682–83; *Skoien II*, 614 F.3d at 641–42  (requiring "some form of strong showing" approximating intermediate scrutiny).  The Fourth Circuit has applied intermediate scrutiny to § 922(g)(3), which prohibits gun possession by drug addicts and unlawful users of controlled substances.  *See Carter I*, 669 F.3d at 417; *see also Yancey*, 621 F.3d at 683 (declining to pick a specific form of scrutiny but requiring a "strong showing that [§ 922(g)(3)] was substantially related to an important governmental objective").  The Seventh Circuit has also applied intermediate scrutiny to § 922(g)(1)'s ban on gun ownership by felons.  *Williams*, 616 F.3d at 692. Likewise, the Fourth and Tenth Circuits have subjected § 922(g)(8), which disallows gun possession by individuals subject to domestic protective orders, to intermediate scrutiny.[14]  *United States v. Mahin*, 668 F.3d 119, 124 (4th Cir. 2012); *United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012); *Reese*, 627 F.3d at 802.

---

[12]We do not suggest that strict scrutiny will never be applicable in a Second Amendment challenge to a gun regulation.  As the Fourth Circuit noted, "[t]he Second Amendment is no more susceptible to a one-size-fits-all standard of review than any other constitutional right. Gun-control regulations impose varying degrees of burden on Second Amendment rights, and individual assertions of the right will come in many forms."  *Chester I*, 628 F.3d at 682 (citation omitted).

[13]Some courts have declined to wade "into the 'levels of scrutiny' quagmire."  *Skoien II*, 614 F.3d at 642. *Greeno*, which necessitates selection of an appropriate level of scrutiny, forecloses this option.  679 F.3d at 518. Nevertheless, even those courts that have avoided the scrutiny morass have adopted inquiries approximating traditional intermediate scrutiny.  *See, e.g.*, *Booker*, 644 F.3d at 25 (requiring "a substantial relationship between the restriction and an important governmental objective"); *Yancey*, 621 F.3d at 683; *Skoien II*, 614 F.3d at 641–42 (requiring "some form of strong showing" that the law is "substantially related to an important governmental objective").

[14]Judge Sutton would have the Court jettison tiers of scrutiny altogether and adopt an individualized approach to the Second Amendment instead.  While his approach has some logical appeal, we will not strike out on

### D.  Applying Intermediate Scrutiny

While the vocabulary of intermediate scrutiny varies across courts, "all forms of the standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Chovan*, 735 F.3d at 1139 (citation omitted); *see also Clark v. Jeter*, 486 U.S. 456, 461 (1988).  "All that is required is 'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'" *Neinast v. Bd. of Trs. of Columbus Metro. Library*, 346 F.3d 585, 594 (6th Cir. 2003) (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).  Because a perfect fit is not required, the government need not prove that there is "no burden whatsoever on [the claimant's] . . . right under the Second Amendment." *Chapman*, 666 F.3d at 228.

### i.  *Important Governmental Interest*

The animating interest of § 922(g) "was to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983); *see also Huddleston v. United States*, 415 U.S. 814, 824 (1974) ("The principal purpose of the federal gun control legislation . . . was to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" (quoting S. Rep. No. 90–1501, at 22 (1968)).  In addition to this general interest, the government offers two additional rationales more specifically related to § 922(g)(4): protecting the community from crime and preventing suicide.  *See* 114 Cong. Rec. 21,829 (1968) (statement of Rep. Bingham) (noting Congress's purpose in § 922(g)(4) to "cut down or eliminate firearms deaths caused by persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances").  These interests are not only legitimate, they are compelling.  *See Washington v. Glucksberg*, 521 U.S. 702, 735 (1997); *Schall v. Martin*, 467 U.S. 253, 264 (1984); *see also United States v. Salerno*, 481 U.S. 739, 747 (1987) ("There is no doubt that preventing danger to the community is a legitimate regulatory goal."); *United States v. Masciandaro,* 638 F.3d 458, 473 (4th Cir. 2011) ("Although the

---

our own analytical path and part ways with nearly all of the circuit courts to analyze gun regulations, including § 922(g), post-*Heller*.

government's interest need not be 'compelling' under intermediate scrutiny, cases have sometimes described the government's interest in public safety in that fashion.").

### ii. Is § 922(g)(4) Substantially Related to the Government's Interest?

The question then becomes one of fit. The government must establish a reasonable fit between its important objectives of public safety and suicide prevention and its permanent ban on the possession of firearms by persons adjudicated to be mentally unstable, some of them long ago. *See Chovan*, 735 F.3d at 1140. Under intermediate scrutiny, "[t]he burden of justification is demanding and it rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996). In discharging this burden, the government can rely on a wide range of sources, including legislative history, empirical evidence, case law, and even common sense, but it may not "rely upon mere 'anecdote and supposition.'" *Carter I*, 669 F.3d at 418 (quoting *United States v. Playboy Enter. Grp., Inc.*, 529 U.S. 803, 822 (2000)).

The quantity and quality of support necessary "to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000). While the Constitution may not require a specific method of proof, the Fourth Circuit's experience with §§ 922(g)(3) and (9) illustrates that some reference to legislative findings, academic studies, or other empirical data is necessary to support the categorical disarmament of citizens, regardless of whether that disarmament is permanent or temporary.

In *Chester I*, the Fourth Circuit remanded a challenge to § 922(g)(9), which imposes a permanent ban on convicted domestic-violence misdemeanants. 628 F.3d at 674. In that case, the government offered "numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal," but failed "to offer sufficient *evidence*" of such a substantial relationship. *Id.* at 683.[15] Likewise, another panel of

---

[15]After remand and another appeal, the court found that § 922(g)(9) satisfied intermediate scrutiny. The court relied on an intervening case, *Staten*, 666 F.3d at 166–67, where the government presented evidence showing that "the actual recidivism rate among domestic violence misdemeanants . . . is at least 33.3%" and that nearly half of all homicides of females nationally were committed by a domestic partner. *United States v. Chester, (Chester II)*, 514 F. App'x 393, 395 (4th Cir. 2013) (citing *Staten*, 666 F.3d at 167).

the Fourth Circuit remanded a challenge to § 922(g)(3) despite the fact that its prohibition, unlike § 922(g)(9), has a "limited temporal reach" which "tracks the ongoing choices of individuals either to remain drug users or to quit drug abuse." *Carter I*, 669 F.3d at 419, 421. In that case, the government chose "not to rely on academic research or other empirical data to demonstrate the connection between drug use and gun violence." *Id.* at 418. While it recognized that the "record need not be as fulsome as that necessary to justify § 922(g)(9)," the court faulted the government's decision to argue that § 922(g)(8)'s fit was "a matter of common sense." *Id.* at 418–19.

As noted previously, the ban imposed by § 922(g)(4) on Tyler, and persons similarly situated to Tyler, is effectively permanent. Because § 925(c)'s relief-from-disabilities program remains unfunded and because Michigan has not chosen to create a qualifying relief program under the 2008 NICS Amendments, there is no path available for Tyler to seek the restoration of his Second Amendment right. The same is true for others barred by § 922(g)(4) in at least nineteen other states. Thus, some evidence of the continuing need to disarm those long ago adjudicated mentally ill is necessary to justify § 922(g)(4)'s means to its ends.

The government relies on both legislative history and empirical evidence to support § 922(g)(4). First, it points to legislative observations about the role of mental illness in two public tragedies, the school shooting at Virginia Tech and a shooting in New York. As Congress observed, individuals with proven histories of mental illness and with recent involuntary commitments perpetrated both shootings. (CA6 R.62 Appellee's Supplemental Br. at 18–19 (citing Pub. L. No. 110-180, §§ 2(9) & 121 Stat. at 2560; 153 Cong. Rec. H16926 (daily ed.) (Dec. 19, 2007) (statement of Rep. Boucher).))[16] This is compelling evidence of the need to bar firearms from those currently suffering from mental illness and those just recently removed from an involuntary commitment. It does not, however, answer why Congress is justified in permanently barring anyone who has been previously committed, particularly in cases like

---

[16]Seung-Hui Cho was committed less than two years before the tragedy at Virginia Tech. *See* Brigid Schulte and Chris L. Jenkins, *Cho Didn't Get Court-Ordered Treatment*, Washington Post, May 7, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/05/06/AR2007050601403 html. Peter Troy was committed less than a year before he shot and killed two people in New York. *See* Bruce Lambert, *Nassau Agency Lost Track of Suspect Before Killings*, N. Y. Times, March 20, 2002, http://www nytimes.com/2002/03/20/nyregion/nassau-agency-lost-track-of-suspect-before-killings html?ref=topics.

Tyler's, where a number of healthy, peaceable years separate the individual from their troubled history.

In addition to these legislative observations, the Brady Center to Prevent Gun Violence has supplied studies showing that those with a past suicide attempt are more likely than the general public to commit suicide at a later date and that firearms are the most likely method for committing suicide.[17]  (CA6 R. 70, Brady Center Amicus Br., at 12 & n.7 (citing *Attempters' Longterm Survival*, Harvard Univ. Sch. of Pub. Health; *Suicide and Self-Inflicted Injury*, Centers for Disease Control & Prevention (Feb. 6, 2015), http://www.cdc.gov/nchs/fastats/suicide.htm).)  This evidence helps to explain why it might be reasonable to prevent those with a past suicide attempt from ever possessing firearms, but it does not fully justify the need to permanently disarm anyone who has been involuntarily committed for whatever reason.  Importantly, nothing in this record suggests that Tyler has ever attempted suicide or that a significant proportion of individuals prohibited by § 922(g)(4) have attempted suicide.

Likewise, the evidence relied on by the government in its motion to dismiss and seized on by Judge Moore's dissent highlights why it may be appropriate to prohibit firearm ownership by currently mentally ill individuals and those who were recently committed, but it does little to justify § 922(g)(4)'s inflexible, lifetime ban.  *See* Slip Op. at 57–59 (Moore, J., dissenting); (DE 23, Gov't Mot. to Dismiss, Page ID 171–73 (citing Frederick E. Vars & Amanda Adcock Young, *Do the Mentally Ill Have a Right to Bear Arms?*, 48 Wake Forest L. Rev. 1, 21 (2013)).)  One of the studies cited indirectly by the government, a meta-analysis of studies of those with prior involuntary commitments, clouds rather than clarifies the connection between prior commitment and future dangerousness.  48 Wake Forest L. Rev. at 21–22 (citing E. Clare Harris & Brian Barraclough, *Suicide as an Outcome for Mental Illness: A Meta-Analysis*, 170 Brit. J. Psychiatry 205 (1997)).  While the study did find that previously committed individuals have a suicide risk "thirty-nine times greater than that expected," it explained that this risk was greatest

---

[17]In its initial brief, the government relied on statistics from the National Institute of Mental Health ("NIMH") showing that prior suicide attempt is a risk factor for later suicide completion.  (*See* CA6 R. 32, Appellee Br. at 26.)  The hyperlink supplied by the government does not lead to a webpage supporting this proposition, but other information on the NIMH's website does explain that a prior suicide attempt is a significant risk factor for suicide.  *See* Thomas Insel, *Director's Blog, The Under-recognized Public Health Crisis of Suicide*, Sept. 10, 2010, http://www.nimh.nih.gov/about/director/2010/the-under-recognized-public-health-crisis-of-suicide.shtml.

"following short first admissions." 170 Brit. J. Psychiatry at 220. Moreover, of the 14,000 patients studied in the meta-analysis, 98% were studied for only a year following their commitment, and the remaining 2% were studied anywhere from 2.5 to 8.5 years post-commitment. *Id.* at 219–20. The study ultimately concluded that "[s]uicide risk seems highest at the beginning of treatment and diminishes thereafter." *Id.* at 223. In support of its motion to dismiss, the government also presented evidence that relapse and readmission are common following an initial commitment, (*see* DE 23, Gov't Mot. to Dismiss, Page ID 174), but the studies the government relied on only analyzed behavior over 1-year and 22-month periods respectively and, thus, do not explain why a lifetime ban is reasonably necessary. (*See id.*)

In its amicus brief, the States United to Prevent Gun Violence notes that after Connecticut began preventing individuals with prior commitments from purchasing firearms, the state "saw a 53% reduction in rates of violent crime perpetrated by such individuals." (CA6 R. 81, Amicus Br. at 11.) This may be evidence that prohibiting gun possession lowers violent crime rates, but the data does not meaningfully compare previously committed individuals' propensity for violence with that of the general population. And without such a comparison, the data is insufficient to justify § 922(g)(4)'s perpetual curtailment of a constitutional right. Add to that the findings of a study cited by Tyler in his briefs before this court, which compares the rates of violence committed by individuals discharged from psychiatric inpatient facilities and the general population in the same communities. (CA6 R. 19, Appellant Br. at 47–48 (citing Henry J. Steadman, et al., *Violence by People Discharged from Acute Psychiatrict Inpatient Facilities and by Others in the Same Neighborhoods*, 55 Archives Gen. Psychiatry 393 (1998)).) The authors found that, when controlling for substance abuse problems, the rates of violent acts perpetrated by involuntarily committed patients and the general population in one community in Pittsburgh was "statistically indistinguishable." 55 Archives Gen. Psychiatry at 400. Moreover, the study's "most unexpected finding [was] the decline in the proportion of subjects engaging in violence over time." *Id.* The authors opined that "[r]ates of violence may peak around the time of hospital admission, when patients are in acute crisis, and remain high for a period of time after discharge because many patients still have active mental disorders after they leave the hospital." *Id.*

The government has not presented sufficient evidence of the continued risk presented by persons who were previously committed. Such evidence has been integral in decisions upholding other portions of § 922(g) that impose permanent bans. For instance, the Fourth Circuit, in upholding § 922(g)(9) under intermediate scrutiny, relied on empirical studies estimating the overall domestic violence recidivism rate to be between 35% and 80% and arrived at "a conservative conclusion . . . that the actual recidivism rate among domestic violence misdemeanants (including re-arrests and unreported incidents) is at least 33.3%." *Staten*, 666 F.3d at 166–67. The court also noted that "the Seventh Circuit sitting *en banc* and the First Circuit have relied upon this same social science evidence to conclude that the recidivism rate among domestic violence misdemeanants is high." *Id.* at 166 (citing *Booker*, 644 F.3d at 26; *Skoien II*, 614 F.3d at 644); *see also Chovan*, 735 F.3d at 1140 (relying on the same evidence cited in *Skoien II*, 614 F.3d at 644, to conclude that "a high rate of domestic violence recidivism exists"). Likewise, the Seventh Circuit also upheld § 922(g)(1) under intermediate scrutiny based, in part, on a study that showed the likelihood that convicted robbers, like the plaintiff, were highly likely to recidivate. *Williams*, 616 F.3d at 693 (citing Note, *Selective Incapacitation: Reducing Crime Through Predictions of Recidivism,* 96 Harv. L. Rev. 511, 515 & n.24 (1982)).

Relatedly, the temporal limitation of other § 922(g) bans has been a key consideration in finding that those regulations pass muster under heightened scrutiny. *See, e.g.*, *Mahin*, 668 F.3d at 125 (noting that § 922(g)(8) is "exceedingly narrow" because it only applied "for the limited duration of [a] domestic violence protective order"); *Carter I*, 669 F.3d at 419 (upholding § 922(g)(3) under intermediate scrutiny in large part because "Congress tailored [§ 922(g)(3)] to cover only the time period during which it deemed [drug users] to be dangerous"); *Chapman*, 666 F.3d at 228 (finding that § 922(g)(8) satisfied intermediate scrutiny's reasonably fit requirement in large part because its regulatory sweep was limited to the duration of a domestic violence protective order); *Yancey*, 621 F.3d at 686–87 (upholding § 922(g)(3) under intermediate scrutiny, in part, because plaintiff "could regain his right to possess a firearm simply by ending his drug abuse" and "[i]n that sense, the restriction in § 922(g)(3) is far less onerous than those affecting felons and the mentally ill").

None of the government's evidence squarely answers the key question at the heart of this case: Is it reasonably necessary to forever bar all previously institutionalized persons from owning a firearm? But perhaps the biggest problem for the government is Congress's most recent answer to this very question: No, it is not. From 1986 to 1992, federal law provided a relief-from-disabilities program whereby individuals prohibited by federal law from possessing firearms could "appl[y] to the Attorney General for relief from [their] disabilities." § 925(c). In 1992, Congress defunded this program, noting that reviewing applications was a "very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made." S. Rep. No. 102-353, at 19 (1992). In 2008, Congress changed its mind. It authorized federal grants to the states for their help in shoring up the NICS instant background check system after a gunman with "a proven history of mental illness" killed dozens at Virginia Tech. *See* NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, § 2(9) (Findings), 122 Stat. 2559, 2560 (2008). To receive federal funds, states are required to create a relief-from-disabilities program that allows individuals barred by § 922(g)(4) to apply to have their rights restored. *Id.* at §§ 103, 105, 122 Stat. at 2568–69. According to the government, thirty-one states currently have such relief programs. The NICS Improvement Amendments Act is a less restrictive alternative to the permanent bar created by § 922(g)(4). It is a clear indication that Congress does not believe that previously committed persons are sufficiently dangerous as a class to permanently deprive all such persons of their Second Amendment right to bear arms.

The government urges a comparison of this case to *Chapman*, where the Fourth Circuit rejected an as-applied challenge to § 922(g)(8). 666 F.3d at 231. The court observed that the statute's constitutionality was not undermined even though it may be "somewhat over-inclusive" because "not every person who falls within[] it would misuse a firearm . . . if permitted to possess one." *Id.* Based on this passage, the government concludes that § 922(g)(4) "would not be unconstitutional even if plaintiff could demonstrate that there were some number of people who were involuntarily committed to a mental institution in the past, but pose no greater risk of firearms violence than the general public currently." (CA6. R. 62, Supplemental Br. at 17.) We agree. Under intermediate scrutiny, a statute can permissibly regulate more conduct (or more people) than necessary. However, the amount of overreach must be reasonable, and it is the government's burden, not Tyler's, to prove that § 922(g)(4)'s "scope is in proportion to the

interest served." *Neinast*, 346 F.3d at 594 (quoting *Fox*, 492 U.S. at 480). In this light, the passage from *Chapman* has limited usefulness. First, § 922(g)(8) is not analogous to § 922(g)(4) because § 922(g)(8)'s bar is limited to the duration of a domestic court order. Second, without any longitudinal evidence documenting that previously committed people, on average, pose a greater threat of violence than members of the general public, we have no way of knowing if § 922(g)(4)'s permanent ban is "somewhat over-inclusive" or if it is much more so.

We recognize that "[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994). And we recognize that in the context of gun safety, "the expense and other difficulties of individual determinations" may necessitate "the inherent imprecision of a prophylactic rule." *Weinberger v. Salfi*, 422 U.S. 749, 777 (1975). Our opinion should not be taken to call into question Congress's power to regulate categorically in this arena.[18] However, § 922(g)(4) imposes a lifetime ban on a fundamental constitutional right. More evidence than is currently before us is required to justify such a severe restriction.

---

[18]Here, we should address Tyler's claim, which is echoed in Judge Sutton's concurrence, that "the Second Amendment affords him at least an opportunity to demonstrate he is the safe, sane, stable individual his doctors say he is and to thereby demonstrate that § 922(g)(4) no longer remains constitutional as applied to him." CA6 R.19, Appellant Br. at 43–44); *see also* Slip. Op at 45 (Sutton, J., concurring). This position goes too far. We will not read *Heller* to require an individualized hearing to determine whether the government has made an improper categorization, and we question the institutional capacity of the courts to engage in such determinations. In *Bean*, the Supreme Court addressed whether the federal courts had jurisdiction to review, in the first instance, a relief-from-disability application under § 925(c). 537 U.S. at 72–73. The Court expressed significant doubt about the ability of courts to conduct a *de novo* review, noting that "[w]hether an applicant is 'likely to act in a manner dangerous to public safety' presupposes an inquiry into that applicant's background—a function best performed by the Executive, which, unlike courts, is institutionally equipped for conducting a neutral, wide-ranging investigation." *Id.* at 77. Further, the Court noted that "the 'public interest' standard calls for an inherently policy-based decision best left in the hands of an agency." *Id.*; *see also Mullis*, 230 F.3d at 219 (noting that "[w]hile district courts are well equipped to make credibility judgments and factual determinations, they are without the tools necessary to conduct a systematic inquiry into an applicant's background"). Given these doubts, we feel it unwise to reject traditional tiers of scrutiny analysis in favor of individualized determinations.

That said, providing Tyler a hearing is certainly one option the government has at its disposal, assuming Congress is willing to appropriate money to the Executive for such determinations. But it is not required to justify the statutory scheme under intermediate scrutiny—although, we imagine that if Congress were to fund the review provision embodied in 18 U.S.C. § 925(c), it would likely render § 922(g)(4) constitutional under any form of scrutiny. Likewise, on remand, the government may, if it chooses, attempt to prove that § 922(g)(4) is constitutional as applied to Tyler because he is not the peaceable, healthy, and responsible citizen he claims to be in his complaint.

We cannot conclude, based on the current record, that the government has carried its burden to establish a reasonable fit between the important goals of reducing crime and suicides and § 922(g)(4)'s permanent disarmament of all persons with a prior commitment. There is no indication of the *continued* risk presented by people who were involuntarily committed many years ago and who have no history of intervening mental illness, criminal activity, or substance abuse. Indeed, Congress's evidence seems to focus solely on the risk posed by those presently mentally ill and who have been recently committed. Any prospective inference we may draw from that evidence is undercut by Congress's recognition, in the 2008 NICS Amendments, that a prior involuntary commitment need not be a permanent impediment to gun ownership.

## IV. Conclusion

Thus, we conclude that Tyler has a viable claim under the Second Amendment and that the government has not justified a lifetime ban on gun possession by anyone who has been "adjudicated as a mental defective" or "committed to a mental institution," 18 U.S.C. § 922(g)(4). Because there are a number of separate opinions in this case, it is imperative that we clearly state the next steps. As I read the opinions, ten of us would reverse the district court; six of us would not. And at least twelve of us agree that intermediate scrutiny should be applied, if we employ a scrutiny-based analysis. It seems therefore that, given the views of the court, the proper resolution of the case is to reverse and remand to the district court for the application of intermediate scrutiny to determine the statute's constitutionality as applied to Tyler. As we see it, the government may justify § 922(g)(4) in one of two ways: (1) with additional evidence explaining the necessity of § 922(g)(4)'s lifetime ban or (2) with evidence showing that § 922(g)(4) is constitutional as applied to Tyler because he would be a risk to himself or others were he allowed to possess a firearm.

---

**CONCURRENCE**

---

McKEAGUE, Circuit Judge, concurring.   I find myself in agreement both with the majority's analysis and with Judge Sutton's concurrence.  I agree with Judge Sutton that the *Heller* Court was referring to the "mentally ill" in the present sense.  Mental illness is not static, so it cannot be constitutional to *permanently* prevent Clifford Tyler from exercising his Second Amendment right without affording him some sort of process to demonstrate that the *non-permanent* label of "mentally ill" no longer applies to him.  In that respect, I agree with Judge Sutton that selecting a tier of scrutiny is not necessary to resolve this case.  I also agree that it would be fruitless to give the government a second bite at the apple to show that 18 U.S.C. § 922(g)(4), sans relief-from-disability process, is adequately tailored.  Tyler has stated a claim for relief and is entitled to the process necessary to demonstrate he is fit to possess a gun.

Yet many of our sister circuits have held tiers of scrutiny apply in the Second Amendment context, and in *United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012), our circuit adopted a two-step approach to (1) determine "whether the challenged law burdens conduct that falls within the scope of the Second Amendment" and (2) apply "the appropriate level of scrutiny" to determine whether the law is constitutional.  *Greeno*, 679 F.3d at 518.  *Heller* did not mandate this approach, but it also did not foreclose it.  If we continue to apply *Greeno*'s two-step analysis, I fully agree with the majority's choice of intermediate scrutiny.  I also agree that the government has fallen woefully short of demonstrating the required reasonable fit between § 922(g)(4) and the government's substantial interests.

Until the Supreme Court clarifies its preferred approach, I agree with the majority *and* Judge Sutton in that once mentally ill does not mean always mentally ill, and under either analytical route we must reverse the district court's decision.

———————————

## CONCURRENCE

———————————

HELENE N. WHITE, Circuit Judge, concurring.  I agree with the lead opinion that the government has not met its burden under intermediate scrutiny.  I write separately to address a few additional points.

At this stage of the proceedings, we must assume that Tyler is not mentally ill, and so I agree with the lead opinion that we deal here with a prohibition on gun ownership by a person who falls within the ambit of the Second Amendment.  The question then is whether Congress's choice to disqualify anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution," 18 U.S.C. § 922(g)(4), is a constitutionally permissible proxy for "the mentally ill," or, applying intermediate scrutiny, is substantially related to, and a "reasonable fit" with, the government's important interests in reducing crime and preventing suicide.

My colleagues' concurring opinions find clarity and certainty that eludes me.  Judge Sutton posits an on/off switch, apparently derived from *Heller*, that inquires, "Is the individual properly characterized as a felon today or as mentally ill today in a way that makes him dangerous to himself or others?"  Concurring Op. at 47 (Sutton, J.).  Similarly, Judge Batchelder appears to argue that, consistent with the common understanding of rights when the Second Amendment was ratified, the right to keep and bear arms must be restored once the individual regains his "reason."  Concurring Op. at 36–38 (Batchelder, J.).  I readily accept the premise that "once mentally ill does not mean always mentally ill," Concurring Op. at 45 (Sutton, J.), but the translation of that truth into the asserted right to an individualized "present-tense" determination is less clear, as are the contours of such a determination, or what constitutes having regained reason.

I am uncertain whether, apart from the permanence of the disqualification, my concurring colleagues accept § 922(g)(4) as a permissible proxy for "the mentally ill," or whether they conclude that Congress cannot constitutionally rely on a state adjudication that someone should

be involuntarily committed or is a "mental defective" as conclusive evidence of mental illness. Assuming these are constitutionally permissible proxies, as I believe they are, does a person so adjudicated have the right to put the government to its proofs immediately after being released from confinement, or would some period of disqualification without the opportunity for an individualized determination of mental health pass constitutional muster? If the person is not presently mentally ill,[1] how does the potential for relapse factor in, if at all? And, if the on/off switch is a function of mental illness and reason, how does dangerousness enter into the equation?[2] Further, what is the legal status of a person whose condition after release from involuntary commitment requires ongoing treatment or medication, but who functions normally and responsibly with that treatment or medication—is that person mentally ill or entitled to a restoration of the right to keep and bear arms? Also, is the statutory test of Section 105 sufficient—that the circumstances of the adjudication or commitment, "and the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest"—or is it too far removed from the constitutionally permissible disqualification of mental illness? *See* NICS Improvement Amendments Act of 2007, Pub. L. No. 110–180, § 105. Although the on/off, present-reason inquiries posited by the concurring judges appear on the surface to be simple and straightforward, they have the potential to be less workable than the means-end scrutiny the opinions reject.

In an ideal world, every disability or privilege would be subject to accurate individual adjudication based on individual facts, but, assuming such adjudication is even possible in the

---

[1]It is unclear whether Judge Batchelder finds mere mental illness a sufficient disqualification, or whether insanity, i.e., the loss of reason, is required to remove someone from the ambit of the Second Amendment.

[2]It is also unclear to me how the on/off switch operates with respect to felons. I understand Judge Sutton to accept as constitutional the permanent bar on gun possession by all felons, even non-violent ones, but the rationale and even some of the language advocating the present-tense inquiry applies to felons as well. Separate and apart from the on-switch being engaged in error due to misidentification—which is a red-herring—criminality is no more permanent than mental illness; just as mental illness is cured, felons are rehabilitated, and just as formerly mentally ill persons have achieved greatness, so have rehabilitated felons. Further, although Judge Sutton finds it self-evident that the lifetime disqualification cannot be applied to felons who have been pardoned, this is a function of statute. *See* 18 U.S.C. § 921(a)(20). A pardoned felon has not had the off switch engaged in error; rather, he has been forgiven.

present context,[3] the Constitution permits legislative judgments and proxies, provided the regulation satisfies the appropriate level of scrutiny. I agree with the lead opinion and Judge Moore's dissent that this court is better equipped to apply means-ends scrutiny to Congress's chosen test for mental illness than to devise a new "on/off" or "restored-to-reason" test that offers only the illusion of certainty. Courts have long applied means-end scrutiny in the First Amendment context and many of our sister circuits have applied this framework to Second Amendment challenges as well.

The question remains whether § 922(g)(4) is a reasonable fit with the important governmental interest in preventing crime and suicide. The definitional fit—adjudication as a mental defective or involuntary commitment—is patently reasonable, but the durational fit is troubling. As the lead opinion explains, although the government has connected mental illness with crime and suicide, it has failed to provide adequate support for a lifetime disqualification of persons previously committed. Therefore, because the government has not, on this record, met its burden to establish a reasonable fit between § 922(g)(4)'s permanent disqualification and the government's important interests in reducing crime and suicides, remand is necessary.

---

[3]Congress permitted the states to enact relief-from-disability programs, and mandated the Section 105 program as a condition of participation in grant programs, Pub. L. No. 110–180, § 103, but Congress also found that ATF officials who had been charged with administering the defunded federal relief-from-disabilities program determined that it was virtually impossible to know with any certainty the present dangerousness of persons who had once been committed due to mental illness, *see* H.R. Rep. No. 102-618, at 14 (1992).

---

**CONCURRING IN MOST OF THE JUDGMENT**

---

BOGGS, Circuit Judge, concurring in most of the judgment. Each of today's opinions holding that the district court should be reversed makes excellent points with respect to this hotly controverted issue and the complicated structure that Congress has established, and I have joined each of them. I write separately to add to the number of opinions only to state the following.

Because the majority of the court has determined not to revisit our precedent in *Greeno*, which requires that we choose and apply a level of scrutiny, I believe that the analysis I laid out in the panel's now-vacated opinion is correct so long as we are bound by *Greeno*. The proper level of scrutiny is strict scrutiny, as with other fundamental constitutional rights, and under that standard of review, the district court's opinion cannot stand for the reasons stated in that opinion.

In light of the view of the majority of the court, however, I acknowledge that the directions given in the lead opinion to the district court are appropriate under the opinion's intermediate-scrutiny standard of review.

---

**CONCURRING IN MOST OF THE JUDGMENT**

---

BATCHELDER, Circuit Judge, concurring in most of the judgment. I agree with the lead opinion that the district court erred in concluding that Tyler could not prevail under *Greeno*'s two-step test, and I also agree with many of the points made in Judge Sutton's opinion concurring in most of the judgment, including that there is no need to apply a tiers-of-scrutiny test to this case and that there is no need to remand it for further proceedings. I write separately because the two-step *Greeno* test employed by the lead opinion and by the second half of Judge Moore's dissent fails to give adequate attention to the Second Amendment's original public meaning in defining the contours of the mental health exception. And it is *that* meaning—as *Heller* and *McDonald* make unmistakably clear—informed as it is by the history and tradition surrounding the right, that counts. *See District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010) (controlling opinion).

By giving little more than a nod to the originalist inquiry, the *Greeno* test radically marginalizes the role played by the text, history, and tradition of the Second Amendment, and it replaces them with the thoroughly modern (and judge empowering) regime of heightened-scrutiny review. Such review, in all its manifold forms, is at bottom an exercise in weighing present costs and benefits. Considering those costs and benefits in this case is more than "an expedition we need not take," Sutton, J., Concurring Op. 6, it is a forbidden peregrination from the actual meaning of the Constitution into the realms of judicial policymaking. The Supreme Court has at every turn rejected the use of interest balancing in adjudicating Second Amendment cases. *Heller*, 554 U.S. at 634–35; *McDonald*, 561 U.S. at 790–91 (controlling opinion). As *Heller* explained, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. . . . Like the First[ Amendment], [the Second] is the very *product* of an interest balancing by the people." 554 U.S. at 634–35.

True, heightened scrutiny review has become *de rigueur* in First Amendment jurisprudence, and *Heller* never said explicitly that it has no place in Second Amendment cases.

But it does not follow from this that we may rely on history only when determining the outer boundary of the right, or that we may subject that right, even down to its very core, to whatever form of heightened scrutiny we deem "appropriate." *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012). The whole tenor of *Heller* and *McDonald* cuts against that approach. *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1282 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); Darrell A.H. Miller, *Retail Rebellion and the Second Amendment*, 86 Ind. L.J. 939, 967 (2011) ("[B]oth *Heller* and *McDonald* indicate strongly that standards of scrutiny are just shorthand for unguided interest balancing."). Both cases conspicuously refrain from engaging in anything resembling heightened scrutiny review, and, unlike the *Greeno* test, both put the historical inquiry at the center of the analysis, not at the margin. The *Greeno* test is, moreover, incompatible with *McDonald*'s assurance that Second Amendment cases will not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." 561 U.S. at 790–91.

> To be sure, [*Heller*] noted in passing that D.C.'s handgun ban would fail under any level of heightened scrutiny or review the Court applied. But that was more of a gilding-the-lily observation about the extreme nature of D.C.'s law—and appears to have been a pointed comment that the dissenters should have found D.C.'s law unconstitutional even under their own suggested balancing approach—than a statement that courts may or should apply strict or intermediate scrutiny in Second Amendment cases. We know as much because the Court expressly dismissed Justice Breyer's [interest-balancing] approach and went on to demonstrate how courts should consider Second Amendment bans and regulations—by analysis of text, history, and tradition.

*Heller II*, 670 F.3d at 1282 (Kavanaugh, J., dissenting) (citations omitted).

Nothing in *Heller*'s discussion of "longstanding prohibitions" suggests otherwise. Quite the opposite: in refuting the charge in Justice Breyer's dissent that these prohibitions were *ipse dixit*, the Court explained that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Heller*, 554 U.S. at 635. There is no reason for lower court judges to pass the time by applying heightened scrutiny—or, as the dissent would have it, by dispensing with review entirely—while we wait for the Supreme Court to step in and do the historical analysis it has

promised.[1]  Moreover, in embracing an approach largely divorced from the text, history, and tradition of the Second Amendment, I fear that we are well on our way to doing what *Heller* and, more importantly, the People who ratified the Second Amendment, forbade: "decid[ing] on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634.

Of course, "[h]istorical analysis can be difficult," *McDonald*, 561 U.S. 742, 803 (Scalia, J., concurring), especially when, as here, we have less historical evidence than we might wish. As one scholar has explained, "[t]he presence of 'distracted' persons or 'lunatics' in colonial America—perhaps due to their small numbers—aroused few expressions of public concern or fear.  Insanity was not perceived as a *social* problem requiring formal public policies."  Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 15 (1994).  Thus, as the lead opinion notes, "[o]ne searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership."  Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1376 (2009).  Moreover, as Judge Boggs noted in the panel opinion of this case, mental institutions were a novelty at the time of the Founding: the first mental hospital in the colonies did not open until 1772.  *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 775 F.3d 308, 321 n.10 (6th Cir. 2014) (quoting Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* 40 (2d ed. 1940)).

But does it follow from this lack of evidence that, as Judge Boggs speculated, it "may . . . be futile" to ask "whether firearm possession by persons previously committed to a mental institution fell within the historical scope of the Second Amendment"?  *Id.*  I do not think so.  The lack of an exact historical antecedent is no more troubling here than it is in a First Amendment case involving internet communications, *see Reno v. Am. Civil Liberties Union*,

---

[1]The lead opinion says that *Greeno* should be retained because it thinks it would be unwise to "strike out on our own analytical path and part ways with nearly all of the circuit courts to analyze gun regulations."  Lead Op. 18–19 n.14.  I understand the desire to keep in step with our sister circuits, of course, but I do not think that in adjudicating fundamental rights we should value uniformity over fidelity to the law, especially in an area where the law is still developing rapidly.  Moreover, discarding *Greeno* hardly entails striking out on our own—the "analytical path" was first cut in *Heller*.  It is the lower courts, both we and our sister circuits, that have departed from that path, engaging in "narrowing from below," *see* Richard M. Re, *Narrowing Supreme Court Precedent from Below*, 104 Geo. L.J. 921, 962–63 (2016), by implementing the increasingly indeterminate framework of heightened scrutiny review, *see Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2326–28 (2016) (Thomas, J., dissenting) (describing the breakdown of the tiers-of-scrutiny doctrines in recent Supreme Court cases).

521 U.S. 844, 849 (1997), or a Fourth Amendment case involving searches conducted using thermal-imaging cameras, *see Kyllo v. United States*, 533 U.S. 27, 31–35 (2001). By examining the Founding generation's conception of "right," as well as the principles of Founding-era mental-health law, we can come to a quite definite conclusion in this case.

To begin with, if we are to adjudicate decisions involving eighteenth-century codifications of rights, it makes sense that we should first give some attention to what that word was understood to mean. Providing a comprehensive definition of such a rich term would, of course, be a complicated task, one that would go far beyond the scope of this brief concurring opinion. For today, it is sufficient to note that the idea of right was intimately connected with the idea of reason, a term that referred not only to the "faculty of the mind by which it distinguishes truth from falsehood [and] enables the possessor to deduce inferences from facts or from propositions," but also to the mind's ability to distinguish "good from evil." 2 Noah Webster, *An American Dictionary of the English Language* (1828).

Thus, the influential eighteenth-century political philosopher Burlamaqui distinguished between "right" and "power," explaining that "power is a physical quality; it is a power of acting in the full extent of our natural strength and liberty: but the idea of right is more confined. . . . [It] is a moral quality. . . . [T]he use of our faculties becomes a right, only so far *as it is approved by reason*, and is found agreeable to [it]." 1 Jean-Jacques Burlamaqui, *The Principles of Natural and Politic Law* 82 (Thomas Nugent, trans., Petter Korkman, ed., Liberty Fund 2006) (1747) (emphasis added). Similarly, Locke described the natural state of man, the condition in which he had all of his natural rights, as a state of perfect freedom cabined only by "the law of nature," which he defined as the rule "*of reason* and common equity, which is that measure God has set to the actions of men, for their mutual security." John Locke, *Two Treatises of Government* (1691), *reprinted in* 4 John Locke, *The Works of John Locke* 207, 339, 342 (12th ed. 1824) (emphasis added). This view was widely accepted by the Founding generation. For example, in his magisterial *Lectures on Law*, Founding Father and law professor James Wilson explained that there could be no right "to do mischief to any one" as this would "transgress . . . the law of nature," which he defined as God's law "communicated to us *by reason* and conscience." James Wilson, *Lectures on Law* (1804), *reprinted in* James Wilson, *Collected*

*Works of James Wilson* 415, 498, 1055–56 (Kermit L. Hall & Mark David Hall, eds., Liberty Fund 2007) (emphasis added).

The emphasis on reason is significant, for, according to Founding-era legal definitions, an insane person was someone who had *lost his reason*. *See* 1 William Blackstone, *Commentaries* *304 ("A lunatic, or *non compos mentis*, is one who hath had understanding, but by disease, grief, or other accident hath lost the use of his reason."); Henry F. Buswell, *The Law of Insanity in its Application to the Civil Rights and Capacities and Criminal Responsibility of the Citizen* 17 (1885) (explaining that, to be found legally insane under longstanding English and American law, a person must be found to harbor a "belief of facts which no rational person would have believed, and [must exhibit] the inability to be reasoned out of such belief" (footnotes omitted)). An insane person was similar to a minor who had not yet attained the age of reason—both were unable, by definition, to exercise their rights because rights could, in the central case, be exercised only by those possessing reason. Conversely, an insane person could not justly be subjected to many of the obligations that corresponded to those rights, such as criminal liability. *See* Buswell, *supra*, at 33, 418–19.

This understanding was well reflected in Founding-era legal doctrine. As Professor Larson has noted, in "eighteenth-century America, justices of the peace were authorized" to order the "confine[ment] [of] individuals with dangerous mental impairments." Larson, *supra*, at 1377–78 (citing Henry Care, *English Liberties, or the Free-born Subject's Inheritance* 329 (6th ed. 1774)). From this it follows *a fortiori* that the government could also disarm such persons, since confining implies first disarming. *Id.*

But this is not to say that mere suspicion of serious mental illness was sufficient at common law to deprive someone of his rights. With the exception of "dangerous lunatics," who could be arrested by anybody, *see* Buswell, *supra*, at 33–34, the common law prohibited the warrantless arrest of those thought to have lost their reason, and it allowed for the deprivation of the fundamental right to liberty or the fundamental right to control one's property only upon a valid judgment from a civil tribunal, *see id.* at 26–28.

Significantly, such deprivations were not once-for-all.  Since at least the time of Edward I (1239–1307), the English legal tradition provided that those who had recovered their sanity should have their rights restored.  *See* 1 Frederick Pollock & Frederic William Maitland, *The History of English Law Before the Time of Edward I* 507–08 (1898).  As one early nineteenth-century legal treatise put it, "[a] lunatic is never to be looked upon as irrecoverable." Anthony Highmore, *A Treatise on the Law of Idiocy and Lunacy* 73 (1807).  And "the law always imagines, that the[] accidental misfortunes [*i.e.*, the misfortunes that caused the lunacy] may be removed." 1 Blackstone, *supra*, at *304–*05; *see also* Care, *supra*, at 329 ("[A lunatic] is to be kept . . . locked up only so long as such lunacy or disorder shall continue, and no longer."). This comports with the Founding-era conception of rights because that which a person recovered when he overcame a serious mental illness was his *reason*, the faculty necessary to exercise his rights.[2]

As I noted at the outset, it is true that § 922(g)(4) has no direct ancestors in the eighteenth century.  But if the government could not, on the basis of mental illness, irrevocably deprive someone of his fundamental right to liberty (and thus of any firearms) or his fundamental right to control his property, why should it be permitted to irrevocably deprive him of the fundamental right to keep and bear arms?  The answer is that it should not.  Why else would *Heller* use the phrase "the mentally ill," rather than "those who once suffered from mental illness"?

It might be argued that guns should be subject to different rules because they are so dangerous.  But while the dangerousness of guns may be relevant when considering what kind of showing someone must make to get his gun rights back, that fact cannot justify treating gun rights as fundamentally different from other rights.  *See McDonald*, 561 U.S. at 780 ("[The right to keep and bear arms is not] a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.") (controlling opinion).  Indeed, it is not as if the restoration of the recovered person's liberty and ability to control his property did not carry with

---

[2]Not only was this the view at the time of the Founding, it is also, as Judge Sutton has ably explained, undoubtedly correct.  Indeed, I am aware of no era or culture that has not recognized that mental illness can sometimes be overcome.  *See, e.g.*, *Daniel* 4:28–36 ("And at the end of the days [of my madness] I Nebuchadnezzar lifted up mine eyes unto heaven, and *mine understanding returned unto me*, and I blessed the most High." (emphasis added)) (King James); further *see generally History of Mental Disorders*, Wikipedia (April 26, 2016, 1:09 AM), https://en.wikipedia.org/wiki/History_of_mental_disorders.

it serious risks either. And, as *Heller* noted, while it is true that, in the decades before the Founding, the right to bear arms was often treated by English courts with far less respect than other fundamental rights, *see* 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1891 (1833) (noting that English common-law courts had circumscribed the right to bear arms to the point where it was "more nominal than real, as a defensive privilege"), that is not how *we* may treat that right, *see Heller*, 554 U.S. at 608; *McDonald*, 561 U.S. at 780 (controlling opinion).

The key fact is that, at the time of the Founding, no fundamental right could lawfully be circumscribed to the extent that § 922(g)(4) regulates gun rights. That provision thus unconstitutionally "infringes" upon Tyler's right to keep and bear arms. U.S. Const. amend. II. Indeed, because it gives him no means to challenge the prohibition, it does far more than "infringe" upon that right, it extirpates it.

The lead opinion largely gets the ultimate answer right. But its conclusions are far less certain than those offered by a *Heller*-style historical analysis. For the reasons I have laid out above, the *Greeno* framework gives me little confidence that this court will not in future cases go from taking rights seriously to seriously taking rights. As has been mentioned many times today, the dangers presented by guns are real, frightening, and obvious. Those realities will continue to factor heavily in the scrutiny analysis. Less obvious to the contemporary judicial mind are the Founding-era fears of tyranny and defenselessness that provided the impetus behind the Second Amendment. Whether the Founding generation struck a wise balance in ratifying that amendment "is perhaps debatable." *Heller*, 554 U.S. at 636. What is not debatable is that we— federal judges—are neither philosopher kings empowered to "fix" things according to the dictates of what we fancy is our superior insight, nor rubber stamps, approving whatever laws the legislatures of this country happen to pass. We are bound, rather, by our oath to uphold and defend the Constitution, and we must therefore show restraint when that document restrains us and be active when it commands action. We must, in other words, say "what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). That task, difficult though it may sometimes be, is straightforward: "A law either infringes a constitutional right, or not; there is no room for the judiciary to invent tolerable degrees of encroachment." *Whole Woman's Health v.*

*Hellerstedt*, 136 S. Ct. 2292, 2329–30 (2016) (Thomas, J., dissenting). The Second Amendment is part of our law; it is a constitutional right possessed by citizens against their governments. Rather than continuing to subject it—as required by *Greeno*—to a means–ends evaluation guided by our own sense of what is important, we should take this opportunity to overrule *Greeno*. For, as *Heller* warned, "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." 554 U.S. at 634.

Accordingly, I agree that this case must be reversed, and although for the foregoing reasons I do not believe a remand is necessary, under the circumstances of this case I agree to a remand, either for entry of judgment in favor of Tyler, or to permit the district court to conduct a hearing into whether Tyler falls under *Heller*'s category of "the mentally ill."

---

**CONCURRING IN MOST OF THE JUDGMENT**

---

SUTTON, Circuit Judge, concurring in most of the judgment. The federal government has determined that, because Clifford Tyler spent thirty days in a mental-health institution in 1986, that makes him mentally ill for life. With that horizon-less generalization in hand, the government claims authority to deny Tyler the fundamental right to possess a gun for the rest of his days, even though Tyler has presented evidence that, some thirty years later, he does not present a risk to himself or others, and even though the government has not presented any individualized evidence about Tyler's fitness to possess a gun but has instead relied on stereotypes about the mentally ill. That is where this case starts and ends—and that is all anyone needs to know to resolve it.

Tyler is entitled to present evidence about whether he would be a risk to himself or others if allowed to own a gun—as Congress once recognized when it funded a program for individuals to obtain precisely this relief from the federal government. 18 U.S.C. § 925(c). Congress's decision in 1992 to cut the funds for that program and Michigan's unwillingness to fill the void with a comparable program of its own do not turn off Tyler's right to show that he, like most Americans, has the constitutional right to own a gun.

1. The Second Amendment establishes a fundamental right for American citizens to possess a gun. *District of Columbia v. Heller*, 554 U.S. 570, 595, 628 (2008); *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3036, 3042 (2010).

2. *Heller* recognizes an exception for some Americans—to respect "longstanding prohibitions on the possession of firearms by felons and the mentally ill." 554 U.S. at 626–27.

3. The statute at issue today, 18 U.S.C. § 922(g), purports to be the kind of prohibition that *Heller* was referring to. It applies to felons and the mentally ill. And it says, as pertinent here: "It shall be unlawful for any person . . . (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; [or] . . . (4) who has been

adjudicated as a mental defective or who has been committed to a mental institution . . . to . . . possess in or affecting commerce[] any firearm."

4. Think of the *Heller* exception as an off switch to the right to bear arms and of § 922(g) as Congress's effort to define it. The statute describes two classes of individuals unable to possess a gun: felons (anyone convicted of a crime punishable by more than one year in prison) and the mentally ill (anyone "adjudicated as a mental defective or who has been committed to a mental institution"). *Heller* did not define these exceptions; it had no reason to. But no one in our case denies these historically grounded and sensible explanations behind the exceptions: Legislatures have authority (1) to impose lifetime gun-possession bans on felons as a safety measure and as a legitimate consequence of a felony conviction and (2) to keep weapons out of the hands of those who, due to psychiatric challenges, pose a risk to themselves or others.

Nor does anyone deny that *Heller* must have been referring to "felons" and "the mentally ill" in the present tense. *Heller* does not stand for the proposition that anyone ever convicted of a felony falls outside the Second Amendment's protections. Otherwise, Congress could ban gun possession by anyone with a felony to their name, even if the conviction was later expunged or the individual was pardoned. *Cf.* 18 U.S.C. § 921(a)(20). So too with mental illness. One's status as a "felon" or as "mentally ill" may change over the course of a lifetime, and *Heller* creates an exception only for those who currently fall into these categories, not for anyone who ever did.

5. Congress first enacted a felon-in-possession ban in 1938, but it did not give felons a way to regain their right to bear arms until thirty years later. Federal Firearms Act, Pub. L. No. 75-785, § 2(f), 52 Stat. 1250, 1251 (1938); An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-341, 75 Stat. 757, 757 (1961); Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, sec. 902, §§ 921(b)(3), 922(f), 925(c), 82 Stat. 197, 228, 231, 233. The initial relief program in 1968 allowed the Secretary of the Treasury to grant an exemption from the firearm ban for certain felons who could show (1) they were not likely to conduct themselves "in an unlawful manner" and (2) "that the granting of the relief would not be contrary to the public interest." Sec. 902, § 925(c), 82 Stat. at 233; *see* sec. 902, § 921(a)(17), 82 Stat. at 228. Congress re-enacted a slightly modified form of this relief program the same year as part of the

Gun Control Act of 1968. Pub. L. No. 90-618, sec. 102, § 925(c), 82 Stat. 1213, 1225. That is also when Congress codified the felon-in-possession ban in its modern form and enacted the mental-illness provision before us today. Sec. 102, § 922(h)(1), (4), 82 Stat. at 1220–21. As of 1968, Congress thus prohibited firearm possession by felons, by anyone "who ha[d] been adjudicated as a mental defective," and by anyone "who ha[d] been committed to any mental institution." But only felons had a chance to gain relief from the ban.

That changed in 1986, when Congress expanded the relief program to ensure that anyone barred from possessing a firearm could seek an exemption, including those once deemed mentally ill. Firearms Owners' Protection Act, Pub. L. No. 99-308, sec. 105, § 925(c), 100 Stat. 449, 459 (1986). The new provision also stated that, if the Secretary denied an exemption, the individual could seek review in federal district court. *Id.* This relief program continued to operate until 1992, when Congress defunded it. Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102-393, 106 Stat. 1729, 1732 (1992). In 2008, Congress replaced the program with one that offered funding to States that set up their own relief regime. Thus far, thirty-one States have set up their own programs. Fed. Gov't Supp. Br. 4. Michigan is not one of them. At no point has Congress required States to set up such programs. *See Printz v. United States*, 521 U.S. 898, 935 (1997).

6. At issue in today's case is whether Congress may create status-based prohibitions on the right to bear arms without permitting individuals to show that the federal government has impermissibly characterized them. Surely it is common ground that the Second Amendment requires the federal government to allow an individual to possess a gun when it makes a classification mistake—when it engages the off switch in error. Say John R. Smith tries to purchase a gun but is told that he cannot do so based on a governmental record that says John R. Smith has a felony conviction or once stayed in a mental-health institution. Smith claims not to be the Smith listed as a felon or listed as residing in an institution. The government ignores Smith's entreaties, and the firearm sale never goes through. Because *Heller* tells us that the Second Amendment protects "the right of law-abiding, responsible citizens" (like Smith) to possess a gun, and because the government has denied Smith that right, it has violated Smith's Second Amendment rights. 554 U.S. at 635. Any other conclusion would give the government

unanswerable authority to deny guns (or for that matter any constitutional right) to whomever it pleases, regardless of whether it has correctly classified the individual as subject to a permissible prohibition on his right to bear arms.

7.    The only difference between that hypothetical and this case is a related characterization problem.  It's not that the government has confused Clifford Tyler with another Clifford Tyler; it's that the government assumes that the mental health of Clifford Tyler in 1986 is the mental health of Clifford Tyler in 2016.  If the individual has ever "been adjudicated as a mental defective" or "has been committed to a mental institution," says the government, that is that:  He necessarily is a risk to himself or others for the rest of his life and thus may not possess a gun for the rest of his life.  That is a remarkable proposition.  It would be one thing if the government were making this argument in 1927.  *See Buck v. Bell*, 274 U.S. 200.  But it is not.  No one today, I would have thought, thinks a prior institutionalization *necessarily* equals a present mental illness.

8.  Keep in mind that Tyler is not demanding a gun today.  He is demanding only what Congress used to permit and what most States still permit:  an opportunity to show that he is not a risk to himself or others.  And keep in mind that the *only* evidence in this case shows that he has a clean bill of mental health, he poses no danger to himself or others, and the health challenges that led him to enter a mental-health facility for thirty days thirty years ago are long gone.  All that the government offers in response is an astonishingly broad generalization:  that a prior institutionalization makes him unfit today.

9.  That generalization cannot be squared with history and tradition.  What determines the scope of the right to bear arms are the "historical justifications" that gave birth to it.  *Heller,* 552 U.S. at 635.  Our common law heritage has long recognized that mental illness is not a permanent condition.  *See* 1 William Blackstone, *Commentaries* *304–05; A. Highmore, *A Treatise on the Law of Idiocy and Lunacy* 104 (1807); *see generally* Batchelder, J., Concurring Op. 37–38.  And that generalization makes even less sense today.  *See, e.g., Foucha v. Louisiana*, 504 U.S. 71, 77–78 (1992).  If there is one thing clear in American law today, it is that the government may not deny an individual a benefit, least of all a constitutional right, based on a sky-high generalization and a skin-deep assumption stemming from a long-ago diagnosis or

a long-ago institutionalization. Once depressed does not mean always depressed; once mentally ill does not mean always mentally ill; and once institutionalized does not mean always institutionalized.

10. That is all there is to this case. Clifford Tyler has presented unrebutted evidence that he is not a risk to himself or others today. If he is right, he has a constitutional right to possess a gun. The government may not deny him that right based on a stigmatizing generalization arising from a mental health problem three decades old. It must give him an opportunity to show that he has the constitutional right to own a gun, all through a process focused on him—not generalizations about "mental defective[s]" or occupants of "mental institution[s]," as the statute infelicitously puts it—and one that will allow Tyler and the government a chance to introduce evidence about *his* capacity to possess a gun.

11. Tiers of review have nothing to do with it. That's simply an expedition we need not take. Would we ask in a case of misidentification—John R. Smith's case—whether intermediate or strict scrutiny applies to the government's classification of him as a felon? I doubt it. Would we ask in the case of an individual, once a felon but no longer one due to a pardon, whether intermediate or strict scrutiny applies to the government's continuing classification of him as a felon? I doubt it. In both of these cases, I would hope, we would say that, because the individual has plausibly alleged that the government placed him in the wrong category, he has a right to show as much in order to protect his right to possess a gun. So too for an individual once classified as mentally ill but who no longer is.

The First Amendment offers a useful analogy. Say the government claims it may regulate a particular type of speech because it is obscene and thus unprotected. *See Miller v. California*, 413 U.S. 15, 23, 36–37 (1973). A court would not look to tiers of scrutiny to figure out whether the government correctly classified the speech; it would independently evaluate whether the speech is in fact obscene. Just so here. The government has assumed power to deny guns to those who were once institutionalized on the theory that they necessarily remain mentally ill and thus are unprotected. That is wrong—not because of anything this or that tier of review tells us but because institutionalization and mental illness are not ever-lasting synonyms. Just as the government may not ban protected speech by labeling it obscene, it may not deny a gun to a

protected individual by labeling him mentally ill for life.  What is true for the First Amendment is true for the Second.

I do not mean to propose that we "jettison tiers of scrutiny altogether" for either the First or Second Amendment.  Lead Op. 19 n.14.  Whatever utility they may have elsewhere, they have no role to play here.  Just as we determine whether a speech restriction is content neutral before deciding "the level of scrutiny applicable" to the speech, we have no need to rule on what level of scrutiny is appropriate for the *Heller* exception when the *Heller* exception does not apply. *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 329 (6th Cir. 2009) (en banc).

12.  The parties, the majority, and the dissent make much of, and at times dispute, the statistical links among mental illness, institutionalization, and gun violence.  That is all well and good—if the individual still has a mental illness.  But that is the only question that matters today. Anything else is a distraction.  The focal point is that mental illness is not invariably a permanent condition,  the premise by the way of a significant branch of the medical profession (psychiatry) that is devoted to ensuring that any such diagnosis does not become a life sentence.  As the Ohio Disability Rights Law & Policy Center confirms in its *amicus* brief, one-half to two-thirds of patients with schizophrenia "significantly improved or recovered" over the course of long-term studies, "including some cohorts of very chronic cases."  Disability Rights Amicus Br. 7; *see* Courtenay M. Harding & James H. Zahniser, "Empirical Correction of Seven Myths About Schizophrenia with Implications for Treatment," 90 *Acta Psychiatrica Scandinavica* 140, 140–41 (1994).  The federal government (at least part of the federal government) agrees, as the Department of Health and Human Services correctly explains that "people with mental health problems get better and many recover completely."  U.S. Dep't of Health & Human Servs., *Mental Health Myths and Facts*, https://goo.gl/Ga6dJ8 (last visited July 28, 2016).

Nor is Clifford Tyler the only American who has overcome a mental illness.  Think of John F. Nash Jr., the Nobel Prize-winning mathematician who spent time in and out of mental institutions but who, "seemingly against all odds, . . . appeared to overcome the illness that had afflicted him for so long" later in life.  Emily Langer, "John F. Nash Jr. Dies; Nobel Laureate's Life Story Inspired 'A Beautiful Mind,'" *Washington Post*, May 24, 2015, https://goo.gl/3gz5b6; Erica Goode, "John F. Nash Jr., Math Genius Defined by a 'Beautiful Mind,' Dies at 86," *N.Y.*

*Times*, May 24, 2015, http://goo.gl/kAmTVk.  Or of Georgia O'Keeffe, who entered a New York hospital in the midst of a nervous breakdown but whose recovery ushered in one of her most productive artistic periods.  Dennis Abrams, *Georgia O'Keeffe* 90–91, 94–96 (2009).  I could go on and on identifying other accomplished individuals, including U.S. Presidents, who have overcome serious mental illnesses.  Jonathan R. T. Davidson et al., "Mental Illness in U.S. Presidents Between 1776 and 1974:  A Review of Biographical Sources," 194 *Journal of Nervous & Mental Disease* 47, 49 (2006).

13.  All we need to know to resolve this case is that *Heller* creates an on-off switch to the right to bear arms, that the government's decision to engage or disengage that right for any individual is not beyond challenge, and that this is a present-tense inquiry:  Is the individual properly characterized as a felon today or as mentally ill today in a way that makes him dangerous to himself or others?  Tyler has plausibly alleged that the government's characterization of him is inaccurate, and he is entitled to relief in the absence of contrary evidence about him.  As the *amicus* brief for the Ohio Disability Rights Law & Policy Center confirms, a considerable body of research and caselaw shows that this outcome is undeniably the right one.  Case after case laments (and corrects) the unfair generalizations that once applied to individuals with mental health challenges.  The key insight is that no government may permanently deny rights based on generalizations stemming from classifications about any individual who once was institutionalized.

The government may not, for instance, deny driver's licenses to formerly institutionalized individuals without a hearing; single out group homes housing the intellectually disabled by requiring them to seek special-use zoning permits; ask applicants broad questions about their mental health history before granting them occupational licenses; or place special limitations on institutionalized individuals' ability to make their own healthcare decisions.  *See, e.g.*, *Gargagliano v. Sec'y of State*, 233 N.W.2d 159, 162–68 (Mich. Ct. App. 1975) (driver's licenses); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447–50 (1985) (special use permits); *Clark v. Va. Bd. of Bar Examiners*, 880 F. Supp. 430, 441–46 (E.D. Va. 1995) (occupational licenses); *Hargrave v. Vermont*, 340 F.3d 27, 31, 34–39 (2d Cir. 2003) (healthcare decisions).  The principle also manifests itself in cases addressing when committed individuals

must be released from confinement, all of which show that institutionalization does not amount to a permanent determination of mental illness or dangerousness. *E.g.*, *Foucha*, 504 U.S. at 75–83; *Jones v. United States*, 463 U.S. 354, 361–69 (1983). And it manifests itself in the Americans with Disabilities Act and the Rehabilitation Act, both of which forbid governments from "den[ying] . . . benefits" to otherwise "qualified individual[s]" solely "by reason of [their] disability" or because they are "regarded as having" a disability. 29 U.S.C. §§ 705(9)(B), 794(a); 42 U.S.C. §§ 12102(1), 12132. Just as one's physical condition changes over the course of a lifetime, worsening at some moments and improving at others, one's mental condition changes as well. A key lesson of disability rights law is that governments may not treat dynamic features as static and immutable.

14. What appears to be driving the government's position are two related fears: (1) that lots of other individuals will start seeking hearings if we grant relief to Tyler, and (2) that some individuals previously deemed mentally incompetent still should not possess a gun today. As to the first concern, no one would get a hearing without making a threshold showing, premised on medical evidence, that they are fit to possess a gun. If there is a risk that the government will be swamped with applications, it is in the best position to prove it. The federal government after all operated a relief program from 1986 to 1992, and yet it offers no evidence—none—that it was flooded by applications from those who had once been institutionalized or received a disqualifying diagnosis. Neither does the government provide any evidence that the thirty-one States that offer such programs have faced problems in operating them. Fed. Gov't Supp. Br. 4.

As to the second concern, the answer is similar. Tyler does not seek anything more than the relief program that once existed at the federal level and that now exists in many States outside Michigan. Where is the evidence that these programs did not then, or do not now, properly perform the needed screening function? Where is the evidence from the federal experience from 1986 to 1992 or from the States in recent years that they could not perform this assessment safely and without exposing the public to undue risks? And if the federal government is skeptical of its capacity to properly perform the screening procedure, why is it encouraging the States to do just that?

Nor is there any reason in fact to distrust the screening procedure. The individual will have to make a threshold showing that he can possess a gun safely today. The government may present contrary evidence if it wishes. And the administrative or judicial decision—essentially a factfinding—will receive deference in any later challenge to it.

15. I disagree with the lead opinion that we can leave the decision whether to give Tyler more process to the district court. That assumes different district courts could reach different decisions about whether to let Tyler present evidence about his mental health on this record. I don't see how that could be so. Tyler has presented plenty of evidence that he is just fine and the government has presented nothing but generalizations to match it. So long as the government refuses to address Tyler's individual circumstances, he is entitled to both a hearing and relief, and no district court judge could fairly conclude otherwise. Giving the government one more chance to "justify" its "lifetime ban" on gun possession by those who were involuntarily committed is a doomed errand. Lead Op. 27. What evidence could possibly show that once-institutionalized individuals invariably have current mental illnesses?

16. I disagree with the dissent for a different reason. It not only thinks that the government *could* meet its burden; it thinks it already has. The dissent cannot deny that the government has applied § 922(g)(4) to prohibit gun possession by mentally healthy individuals like Tyler. But it thinks that intermediate scrutiny permits the government to cast a sufficiently wide net to permit a prior diagnosis to be a proxy for a present health condition in view of the risk posed by other less healthy individuals. Dissent at 56–62. It is not uncommon in constitutional law to create rules that prophylactically over-protect constitutional rights. *See Miranda v. Arizona*, 384 U.S. 436, 467–79 (1966); *Mapp v. Ohio*, 367 U.S. 643, 655–60 (1961). Less common, indeed unprecedented, is the attempt to create a judicial rule that prophylactically *under-protects* individual constitutional rights. I would not go down that road.

\* \* \*

When all is said and done, this case turns on the recognition that mental illness is not a permanent classification, and yet the government has treated it as such in denying Tyler a gun. Through numerous thoughtful opinions in this case, no judge has challenged this point: Mental

illness is not a fixed state of mind.  Unable to shake the conclusion that follows from that agreed-upon premise, I would reverse the district court's decision and hold that Tyler has stated a claim for relief under the Second Amendment and is entitled to the kind of process the government once provided to show that he is fit to possess a gun.  Under these circumstances, the district court's decision should be reversed, and the case should be remanded to the district court either to enter judgment for Tyler or to permit the district court to hold a hearing over whether Tyler is currently "mentally ill."

_____

**CONCURRING IN PART AND DISSENTING IN PART**

_____

ROGERS, J., dissenting.  I join Parts I, II, III.A-C, and Part III.D.i of the lead opinion. However, for the reasons given in Part II.B of Judge Moore's dissent, § 922(g)(4) meets the requirements of intermediate scrutiny.  The judgment of the district court dismissing Tyler's suit in its entirety should accordingly be affirmed.

———————

**DISSENT**

———————

KAREN NELSON MOORE, Circuit Judge, dissenting.  I respectfully dissent because I believe that we can resolve the constitutionality of 18 U.S.C. § 922(g)(4) on *Heller*'s own terms, as we have done for the felon-dispossession provision of § 922(g)(1), and thus there is no need to conduct the two-step inquiry of *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012). Moreover, if the two-step inquiry were to apply, I believe that § 922(g)(4) survives intermediate scrutiny.  Accordingly, I would uphold § 922(g)(4) as constitutional and affirm the district court without need for remand.

I.

I disagree with the lead opinion's conclusion that *Heller* itself does not provide an answer to the constitutionality of § 922(g)(4).  As the lead opinion notes, the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), recognized that although the Second Amendment bestowed an individual right, this "right was not unlimited, just as the First Amendment's right of free speech was not."  Specifically, the Court cautioned:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27.  In an accompanying footnote, the Court noted that it "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26.

We have relied on this language in *Heller* to reject Second Amendment challenges to felon-in-possession convictions under § 922(g)(1) without examining history or applying any level of means–end scrutiny. *See United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010); *see also United States v. Khami*, 362 F. App'x 501, 507 (6th Cir. 2010) ("[O]ur sister Circuits have found that the pronouncement in *Heller* . . . is sufficient to dispose of the claim that § 922(g)(1)

is unconstitutional."). This is because we have found that *Heller*'s inclusion of felon-dispossession statutes in its list of "longstanding prohibitions" reflects that the Second Amendment "is specifically *limited* in the case of felon prohibitions." *Carey*, 602 F.3d at 741 (citing *Heller*, 554 U.S. at 626–27). The same must be true for prohibitions on the possession of firearms by the mentally ill, a "longstanding prohibition[]" explicitly mentioned in the same passage. Accordingly, we should evaluate Second Amendment challenges to § 922(g)(4) just as we evaluate Second Amendment challenges to § 922(g)(1).

The lead opinion's reasoning for using a different approach to evaluate challenges to § 922(g)(4), as opposed to § 922(g)(1), is not persuasive. First, resolving this case under *Heller*'s own terms would not require taking "an analytical off-ramp to avoid constitutional analysis." Lead Op. at 10. The lead opinion cites cases criticizing an approach that "treat[s] *Heller*'s listing of 'presumptively lawful regulatory measures[]' . . . as a kind of 'safe harbor.'" *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010); *see* Lead Op. at 10 n.6. But the "safe harbor" analysis that the Fourth Circuit was criticizing in *Chester* is an approach that some courts have used to evaluate laws that are "*unlisted*" in *Heller*'s "presumptively lawful" passage, such as § 922(g)(9)'s dispossession of domestic-violence misdemeanants. *Id.* at 679 (emphasis added). Under this approach, courts rely on *Heller* to uphold these laws—without conducting an inquiry into means–end scrutiny—if "they deem [an unlisted law] to be *analogous* to those measures specifically listed in *Heller*." *Id.* (emphasis added); *see, e.g., United States v. White*, 593 F.3d 1199, 1206 (11th Cir. 2010) ("We see no reason to exclude § 922(g)(9) from the list of longstanding prohibitions on which *Heller* does not cast doubt."). In assessing the constitutionality of § 922(g)(4), by contrast, no analogy is needed. "[P]rohibition[] on the possession of firearms by . . . the mentally ill," *Heller*, 554 U.S. at 626, *is* "specifically listed in *Heller*." *Chester*, 628 F.3d at 679. Indeed, it is listed directly beside another "permissible" prohibition—possession by felons. *See Heller*, 554 U.S. at 626, 635. Accordingly, relying explicitly on *Heller*'s "presumptively lawful" language to resolve Second Amendment challenges to § 922(g)(4), as we do with challenges to § 922(g)(1), would be a direct application of the Supreme Court's language regarding the scope of *Heller* and the meaning of the Second Amendment.

Second, the lead opinion reasons that we cannot rely on *Heller* conclusively "given § 922(g)(4)'s lack of historical pedigree." Lead Op. at 11. But again, the lead opinion fails to offer a persuasive reason for why this demands treating challenges to § 922(g)(4) differently than challenges to § 922(g)(1). The lead opinion quotes the Seventh Circuit in noting that "legal limits on the possession of firearms by the mentally ill . . . are of 20th Century vintage." *Id.* (alteration in original) (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010)). The lead opinion's ellipsis omits a single significant word: "*also.*" *See Skoien*, 614 F.3d at 641 (emphasis added). This "also" refers to felon-dispossession statutes, which *Skoien* discussed in the same paragraph. *See id.* The Seventh Circuit in *Skoien* recognized that "[t]he first federal statute disqualifying felons from possessing firearms was not enacted until 1938[,] . . . 147 years after the states ratified the Second Amendment." *Id.* at 640. "[T]he ban on possession by *all* felons"—as opposed to only violent felons—"was not enacted until 1961." *Id.* (citing Pub. L. No. 87-342, 75 Stat. 757); *see also Chester*, 628 F.3d at 679 ("Federal felon dispossession laws, for example, were not on the books until the twentieth century, and the historical evidence and scholarly writing on whether felons were protected by the Second Amendment at the time of its ratification is inconclusive.").[191] Section 922(g)(4) was enacted in 1968, seven years later. *Skoien*, 614 F.3d at 641 (citing Pub. L. No. 90-618, 82 Stat. 1213, 1220). If the relevant historical marker is the ratification of the Second Amendment, a seven-year (or even thirty-year) delay between enactment of § 922(g)(1) and § 922(g)(4) hardly justifies differential treatment on the basis of "historical pedigree."

Third, the lead opinion suggests that we may not rely exclusively on *Heller*'s discussion of bans on "the mentally ill" because § 922(g)(4) "does not use the phrase 'mentally ill,' nor does it attempt to prohibit all currently mentally ill persons from firearm possession." Lead Op. at 11. This does not support disregarding *Heller*'s language. In recognizing "longstanding prohibitions on the possession of firearms by . . . the mentally ill," 554 U.S. at 626, the *Heller* Court was

---

[1]According to Professor Larson, the first *state* law providing for felon disarmament "was enacted in New York in 1897," with others following in the beginning of the 20th century. Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009). Thus, even using the earliest state law as a basis, felon-dispossession statutes did not exist at the time of the Second Amendment's ratification and, at the most, are only three years removed from being of "20th century vintage" themselves. *See Skoien*, 614 F.3d at 641.

almost certainly referring to § 922(g)(4). There are a number of firearm-related restrictions in federal law, but only one—§ 922(g)(4)—could plausibly be interpreted as seeking to restrict the rights of the "mentally ill," however defined. Although § 922(g)(4) does not explicitly use the phrase "mentally ill," the statute—reasonably read—sets out two ways in which individuals can fall into *one* classification: that of being "mentally ill" for the purposes of firearm dispossession. In selecting involuntary commitment and incompetency as the metrics for dispossession, Congress chose to "piggyback on determinations made in prior judicial proceedings to establish status" for the purposes of the statute, rather than relying on a "free floating" definition of current mental illness. *United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012) (emphasis omitted). When the *Heller* Court spoke of bans on possession for the "mentally ill," it was referring to § 922(g)(4) and its definitions.

Finally, I fail to see how Tyler's "lifetime ban" under § 922(g)(4) "calls into question the applicability of *Heller*'s presumption of lawfulness" to the statute. Lead Op. at 12. Section 925(c)'s relief-from-disabilities program is unavailable to individuals dispossessed under § 922(g)(1), just as it is unavailable to individuals dispossessed under § 922(g)(4). Nonetheless, we rely on *Heller* to dispossess felons—even if the individual committed a non-violent felony and even if the crime happened thirty years in the past—because Congress chose to dispossess all felons in § 922(g)(1) and *Heller* described this prohibition as a "presumptively lawful regulatory measure[]." 554 U.S. at 626; *see Carey*, 602 F.3d at 741. This same reasoning applies to prohibitions on the "mentally ill," and the lead opinion has not offered a meaningful distinction.

In sum, given *Heller*'s explicit language that "prohibitions on the possession of firearms by felons" are "presumptively lawful," we have rejected Second Amendment challenges to § 922(g)(1) without inquiry into means–end scrutiny. Prohibitions on possession by the "mentally ill" are included in the same sentence of *Heller* as prohibitions on possession by felons. *Heller* thus instructs that the Second Amendment is "specifically *limited* in the case of" prohibitions on possession by the mentally ill. *See Carey*, 602 F.3d at 741; *see also Heller*, 554 U.S. at 626–27. Because I do not believe that it is necessary to apply *Greeno*'s two-step framework, I would find § 922(g)(4) constitutional under *Heller*'s own terms.

II.

A.

Assuming that the two-step framework of *Greeno* applies, I agree that we should review § 922(g)(4) under intermediate scrutiny.[2]  I disagree, however, that a remand is necessary to resolve the question of whether § 922(g)(4) withstands intermediate scrutiny because I believe that the government has met its burden.

To begin, I wholeheartedly agree with the lead opinion that intermediate scrutiny is appropriate to evaluate challenges to possession prohibitions such as § 922(g)(4) because intermediate scrutiny requires the government to justify its firearm laws while simultaneously "giving [Congress] considerable flexibility to regulate gun safety." *Bonidy v. USPS*, 790 F.3d 1121, 1126 (10th Cir. 2015); *see* Lead Op. at 17–18.  But we should be mindful of the Second Amendment context in applying intermediate scrutiny, as well.  As recently recognized, "the nature of firearms regulation requires ample deference to the legislature" under intermediate

---

[2]Judge Sutton's concurrence eschews a means–ends analysis and remarks that, because the problem is one of "misidentification," "[t]iers of review have nothing to do with it." Sutton Concurring Op. at 45. This is incorrect. As stated *infra*, in enacting § 922(g), Congress intended to reduce firearm-related homicide and suicide. *See* R. 23 (Gov't Mot. to Dismiss at 33–34) (Page ID #170–71). In so doing, Congress prohibited firearm possession for certain categories of individuals, including those who pose a potential risk for firearm violence based on a demonstrated history of mental illness. As discussed *supra*, Congress did not choose to enact in § 922(g) a "free floating prohibition" on possession by individuals who are currently "mentally ill and dangerous." *Rehlander*, 666 F.3d at 50. Rather, Congress chose two categories—rooted in "prior judicial proceedings"—"to establish status" for the purposes of the statute, *id.* (emphasis omitted): individuals "who ha[ve] been adjudicated as a mental defective" and individuals "who ha[ve] been committed to a mental institution." § 922(g)(4). It is undisputed that Tyler falls into the latter category; he has not been misidentified. The question for our court to answer is whether Congress's chosen categories of dispossession—and Congress's chosen length of dispossession—are sufficiently related to Congress's interest. This is a question of means–ends scrutiny, and it is a question that our court is well equipped to handle.

Further, in avoiding a scrutiny inquiry, Judge Sutton's concurrence makes much of the "unrebutted evidence" that Tyler has presented "that he is not a risk to himself or others today." *See* Sutton Concurring Op. at 45. This overstates the posture of this case and the evidence in the record. Tyler's complaint says only the following about his mental condition: (1) that in 1986, he was involuntarily committed, and (2) that he "currently is not a risk to himself or to other people and does not have issues with substance abuse." R. 1 (Compl. at 6) (Page ID #6). Tyler's complaint refers to two attached medical evaluations. *Id.* The first reports that Tyler has average cognitive ability and "no evidence of thought disorder," but notes that one administered test was "rendered invalid." R. 1-1 (Osentoski Eval. at 2) (Page ID #20). The report concludes that "[t]here is no evidence of mental illness within this evaluation." *Id.* The second medical evaluation reports that "[f]rom all the information [Tyler] provided it does not appear that [Tyler] has a substance abuse problem." R.1-1 (Rozelle Eval. at 3) (Page ID #24). This is hardly "plenty of evidence," *see* Sutton Concurring Op. at 49, and because we confront this issue in the context of a motion to dismiss, *see* R. 23 (Gov't Mot. to Dismiss) (Page ID #124), there is an understandable lack of rebuttal evidence in the record regarding Tyler's condition.

scrutiny because "[f]irearm policy is a 'complex and dynamic' issue implicating 'vast amounts of data'" that "is either incomplete or influenced by partisanship." *Heller v. District of Columbia*, 801 F.3d 264, 282 (D.C. Cir. 2015) (Henderson, J., concurring in part and dissenting in part) (internal quotations omitted). The legislature—as opposed to the judiciary—is "far better equipped . . . to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Id.* (internal quotation marks omitted). And significantly, in evaluating firearm laws, the consequences are real. *See id.*; *see also Bonidy*, 790 F.3d at 1126. Judicial restraint is particularly appropriate because "[w]e do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011). Here, I believe that the record contains sufficient evidence for our court to conclude that § 922(g)(4) is "substantially related" to the government's compelling interests in preventing gun violence against others and, particularly, preventing firearm-related suicide. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988).

B.

First, § 922(g)(4) is substantially related to the government's compelling interest in preventing gun violence against others. The government presented to the district court several studies demonstrating a link between mental illness and an increased risk of violence. *See* R. 23 (Mot. To Dismiss at 33–34) (Page ID #171–72). The link between involuntary commitments and firearm violence has also been borne out in empirical research relating to gun-control policy. As the States United to Prevent Gun Violence provides in its amicus brief, "when Connecticut began reporting records of mental health adjudications to the federal NICS database in 2007—thereby preventing individuals with prior civil commitments, but no previously disqualifying criminal history, from passing a background check," Connecticut "saw a 53% reduction in rates of violent crime perpetrated by such individuals." *See* States United to Prevent Gun Violence Amicus Br. at 11.

Second, and more significantly, § 922(g)(4) is substantially related to the government's compelling interest in preventing firearm-related suicide. The data related to suicide risk for

individuals who are mentally ill—and, specifically, individuals previously subjected to an involuntary commitment—is stark. The government cited several empirical studies in its motion to dismiss in the district court demonstrating the link between mental illness, firearms, and suicide. For example, the government cited studies and articles suggesting that "[n]inety percent (or more) of suicide victims in the United States suffered from mental illness." R. 23 (Gov't Mot. to Dismiss at 34 n.23) (Page ID #171) (quoting Frederick E. Vars & Amanda Adcock Young, *Do the Mentally Ill Have a Right to Bear Arms?*, 48 Wake Forest L. Rev. 1, 21 (2013)). A law review article relied upon by the government further reports that individuals released after involuntary commitments, specifically, had "a suicide risk *thirty-nine times* greater than expected." Vars & Adcock Young, *supra*, at 22 (emphasis added); *see also* R. 23 (Gov't Mot. to Dismiss at 35) (Page ID #172) (discussing higher rate of suicide "among people who have previously been committed").

Moreover, the government presented evidence about the disproportionately lethal rate of suicides involving firearms as opposed to suicides using other means. R. 23 (Gov't Mot. to Dismiss at 35–36) (Page ID #172–73). As one report shows, although the total fatality rate for all methods of suicide is nine percent, the fatality rate for suicide by firearm is *eighty-five* percent. Means Matter, *Lethality of Suicide Method*, Harv. Univ. Sch. of Pub. Health, http://www.hsph.harvard.edu/means-matter/means-matter/case-fatality (last visited April 7, 2016); *see* Brady Ctr. to Prevent Gun Violence Amicus Br. at 11–13. This higher mortality rate is particularly troubling given that, as the government provides, "[h]aving a gun in the home [is] a strong risk factor for gun-related suicide . . . but [is] inversely related to committing suicide with a nonfirearm method." R. 23 (Gov't Mot. to Dismiss at 35–36) (Page ID #172–73) (quoting Douglas J. Wiebe, *Homicide and Suicide Risks Associated With Firearms in the Home: A National Case-Control Study*, 41 Annals of Emergency Med. 771, 777 (June 2003)). "Importantly, not having a gun appears to deter a substantial number of suicide attempts altogether, rather than simply steering the victim to alternative means." Vars & Adcock Young, *supra*, at 19 (citing Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 New Eng. J. of Med. 989, 990 tbl. (2008)).

The government has also established that the permanent nature of the disability is substantially related to its compelling interests. In its motion to dismiss, the government presented evidence to the district court regarding the high rate of relapse for individuals who have previously been involuntarily committed. *See* R. 23 (Gov't Mot. to Dismiss at 37) (Page ID #174). Given the strong potential for relapse, and the difficulty in determining which previously committed individuals will pose further danger to themselves or others, Congress permissibly chose a broad prohibition. The rationale behind this policy choice is illustrated by Congress's experience administering § 925(c)'s federal relief-from-disabilities program. Congress found that, under the program, "ATF officials [were] required to guess whether . . . a person committed to a mental institution can be entrusted with a firearm," and after "spend[ing] many hours investigating . . . there [was] no way to know with any certainty whether the applicant [was] still a danger to public safety." H.R. Rep. No. 102-618, at 14 (1992). Congress recognized that if an ATF official made an incorrect determination, "a mistake could have devastating consequences for innocent citizens." *Id.*

The lead opinion seemingly does not fault Congress for enacting, and then defunding, § 925(c); rather, the lead opinion focuses on "Congress chang[ing] its mind" in 2008 when it enacted the NICS Improvement Amendments Act. *See* Lead Op. at 25. But it is unclear why Congress's decision to enact this law in 2008 affects the analysis of § 922(g)(4). As the government argues, "Congress may permissibly enact laws more protective of constitutional rights than is required by the Constitution," and its decision to do so does not mean that its original action was contrary to the Second Amendment. *See* Federal Appellees Supp. Br. at 21. As discussed above, the government has provided evidence demonstrating that § 922(g)(4), as enacted, is substantially related to achieving the government's compelling interest in preventing violence and suicide. That Congress chose to permit forms of discretionary relief to disabled individuals—either federally or through the states—does not undermine this conclusion.

The lead opinion emphasizes that the "NICS Improvement Amendments Act is a less restrictive alternative to the permanent bar created by § 922(g)(4)." Lead Op. at 25. But it is well settled that "intermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective," including when the law at issue relates

to Second Amendment rights. *Masciandaro*, 638 F.3d at 474. Moreover, the federal relief-from-disabilities program of § 925(c) is *also* "a less restrictive alternative to the permanent bar," and thus, under the lead opinion's reasoning, should similarly demonstrate that Congress does not feel that § 922(g)(4)'s disability should be permanent. Section 925(c)'s relief-from-disabilities program, however, applies to *all* of § 922(g)'s disabilities. If Congress's decision to create a relief-from-disabilities program indicates Congress's skepticism regarding the scope of the originally enacted law, as the lead opinion indicates, then Congress's decision to enact § 925(c) should equally cast doubt on the scope of each of § 922(g)'s disabilities. But this cannot be the case.

At bottom, the NICS Improvement Amendments Act is not meaningfully different than other federal firearm provisions that permit a state to choose to restore rights to a state citizen prevented by federal law from owning a firearm based on a prior state-level adjudication. For example, under § 921(a)(33)(B)(ii), a person whose "conviction [for a domestic-violence misdemeanor] has been expunged or set aside" or who "has had civil rights restored" by a state "shall not be considered to have been convicted" of a misdemeanor crime of domestic violence for the purposes of federal firearm law. Section 921(a)(20) provides substantially the same for felony convictions. *See also McGrath v. United States*, 60 F.3d 1005, 1009 (2d Cir. 1995) (explaining that, in enacting § 921(a)(20), "Congress sought to accommodate a state's judgment that a particular person or class of persons is, despite a prior conviction, sufficiently trustworthy to possess firearms"). These provisions, like the NICS Improvement Amendments Act, are consistent with the overall purpose of the Gun Control Act of 1968, which is "to assist the States effectively to regulate firearms traffic within their borders." H.R. Rep. No. 90-1577, at 4411 (1968); *see* Federal Appellees Supp. Br. at 20-21. Unlike the lead opinion, I cannot read Congress's decision to allow states to choose to create a relief-from-disabilities program for persons dispossessed by § 922(g)(4) as "a clear indication that Congress does not believe that previously committed persons are sufficiently dangerous as a class to permanently deprive" them of the right to bear arms. Lead Op. at 25. Congress's decision to enact the NICS Improvement Amendments Act does not alter the fact that § 922(g)(4), as originally enacted, is constitutional.

The government has established that individuals released from involuntary commitment have a higher rate of suicide than the general population, and that these numbers are substantial. *See* R. 23 (Gov't Mot. to Dismiss at 35) (Page ID #172); *see also* Vars & Adcock Young, *supra*, at 22. The government has demonstrated that ownership of a firearm is a risk factor for suicide and that firearms are disproportionately lethal as compared to other means. *See* R. 23 (Gov't Mot. to Dismiss at 35–36) (Page ID #172–73). The government has also provided research related to the rate of relapse for individuals who have been involuntarily committed, *see id.* at 37 (Page ID #174), and has persuasively demonstrated the difficulty inherent in making individualized assessments of dangerousness based on a past history of mental illness. *See* Federal Appellees Supp. Br. at 14; *see also* H.R. Rep. No. 102-618, at 14. "These established facts along with logic and common sense" demonstrate "that the government has carried its burden of establishing a reasonable fit between the substantial government objective of reducing" firearm violence and prohibiting individuals with prior involuntary commitments from possessing firearms. *See United States v. Staten*, 666 F.3d 154, 167 (4th Cir. 2011). Under intermediate scrutiny, this analysis does not change simply because Congress could have selected narrower alternatives. As the Ninth Circuit recognized in upholding § 922(g)(9)'s permanent dispossession of domestic-violence misdemeanants in the face of a Second Amendment challenge, Congress "could have easily created a limited duration rather than lifetime ban," or Congress "could have created a good behavior clause under which individuals without new domestic violence arrests or charges within a certain number of years of conviction would automatically regain their rights to possess firearms." *United States v. Chovan*, 735 F.3d 1127, 1142 (9th Cir. 2013). "But Congress did not do so." *Id.* The same is true here. Certainly, Congress could have enacted a firearm disability that disarmed only individuals who are currently involuntarily committed, or Congress could have limited § 922(g)(4)'s disability to individuals involuntarily committed within the last ten, twenty, or thirty years. The question under intermediate-scrutiny review is whether the law that Congress *did* enact is substantially related to the government's interests, not whether it is the least restrictive law or the wisest policy decision. *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 217–18 (1997).

C.

In enacting § 922(g)(4), "Congress permissibly created a broad statute," with an "express intent to establish a 'zero tolerance policy' towards guns" and individuals with a demonstrated history of mental illness. *See Chovan*, 735 F.3d at 1142. Under intermediate scrutiny—and mindful of the context within which we evaluate this law—I believe that the government has demonstrated that § 922(g)(4) is substantially related to Congress's objectives of reducing the substantial homicide and suicide rates caused by firearms. I would therefore hold that § 922(g)(4) is constitutional under intermediate-scrutiny review without any need to remand to the district court for further evidentiary development. For these reasons, and for the reasons expressed in Part I, *supra*, I respectfully dissent.